# MARANDE *v.* TEXAS & PACIFIC RAILWAY COMPANY.

**ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.**

No. 86. Argued January 8, 9, 1902.—Decided February 24, 1902.

This was an action to recover from the railway company the value of plaintiffs' cotton destroyed by fire while in the company's cars on its tracks near its terminal wharf. On the facts, *Held*: 1. That the obvious danger resulting from the use of locomotives about so easily ignitible a material as cotton was clear and the jury would have been reasonably justified in drawing the inference that it had caused the fire; 2. That the proof

showed negligence in the care of the property; 3. That the jury would have had reasonable ground to infer negligence from the inadequacy of the fire apparatus, and from the want of instructions as to its use, or competent men to handle it.

THIS action was commenced to recover from the Texas and Pacific Railway Company the value of sixty-five bales of cotton destroyed by fire on the night of the 12th of November, 1894, whilst the cotton was in the cars of the railway company standing on its tracks in the rear of or in close proximity to a terminal wharf of the corporation situated opposite the upper portion of the city of New Orleans, on the west bank of the Mississippi River, at a point called Westwego. · The cotton formed part of one hundred bales shipped from Greenville, Texas, on the 29th of October, 1894. An export bill of lading was given by the Sherman, Shreveport and Southern Railway Company, that company purporting to act not only on its own but also on behalf of the Texas and Pacific Railway, and of the Elder, Dempster & Co. steamship lines. The bill of lading provided for the carriage of the cotton from the point of shipment "to the port of New Orleans," and thence by the steamship line to Havre, France, and contained numerous conditions and exceptions, one of which exempted the carrier from all loss occasioned by fire. Responsibility of the railway company for the value of the cotton destroyed by fire, although at the time of its destruction it was in the possession of the railway under the bill of lading, was based on the assumption, first, that the fire was due to the negligence of the corporation ; and, second, that the carriage of the cotton to the terminal wharf at Westwego, for transhipment there to the steamship line, was a deviation, and hence the railway company was not entitled to avail itself of the exception against loss by fire.

Upon issue joined, a trial was had in the Circuit Court. After the plaintiffs had introduced their testimony and rested their case, the defendant requested the court to take the case from the jury by giving a peremptory instruction in its favor. This was asked on the ground that there was no proof sufficient to go to the jury either as to the alleged negligence or the asserted deviation. The court granted the request, and exceptions were

duly saved by the plaintiffs. From the judgment entered on the verdict the plaintiffs prosecuted error to the Circuit Court of Appeals for the Second Circuit, and in that court the judgment was affirmed.

The case being one depending not solely on diverse citizenship, the defendant corporation being chartered by an act of Congress, the plaintiffs prosecuted error to this court.

*Mr. Treadwell Cleveland* for plaintiffs in error. *Mr. Frederick E. Mygatt* and *Mr. George Richards* were on his brief.

*Mr. Rush Taggart* for defendant in error. *Mr. Arthur H. Masten* was on his brief.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

Questions involving the liability of the defendant for damage occasioned by the loss of other cotton by the fire which destroyed the cotton, the value of which is now sought to be recovered, have been previously decided by this court. *Texas & Pacific Railway Co.* v. *Clayton*, 173 U. S. 348; *Same* v. *Reiss et al.*, 183 U. S. 621; and *Same* v. *Callender*, 183 U. S. 632. Whilst in deciding these cases it was essential to refer to and in some respects consider the course of business at the terminal wharf at Westwego, the controversy which here arises for decision involves different considerations, and causes it to be necessary to more fully refer to the establishment of the wharf at Westwego and the course of business at that place prior to and at the time the fire occurred.

In the Circuit Court of Appeals there were a number of assignments of error; now, however, only four of such assignments are pressed : the first, the twelfth, the thirteenth and the fourteenth. As the first of these only complains generally that the Circuit Court of Appeals erred in affirming the judgment, and the fourteenth is a mere reiteration of the first, the only assignments which we are called upon to consider are the twelfth and the thirteenth. The one asserts that the case should have been allowed to go to the jury on the issue of de-

viation, the other that error was moreover committed in not permitting the plaintiff to go the jury on the general question of the loss of the cotton by the negligence of the defendant railway.

In order to pass upon the issues arising on these assignments, the evidence must be considered. In taking it into view, however, we shall do so only to the extent necessary to enable us to decide the question of law which arises, that is, was the evidence sufficient on the subject of negligence and deviation to go to the jury?

Approaching the city of New Orleans, on the opposite or right descending bank of the Mississippi River, the track of the Texas and Pacific Railroad terminated prior to 1873 at a point called Gouldsboro. There the company had a railway yard, roundhouse, and other structures. It there also had a terminal wharf with an incline, by means of which its cars could be transferred directly across the river by boat to a depot and yard belonging to the company situated at the foot of Thalia street, at about the center of the river front of the city of New Orleans. At the Thalia street depot freight for New Orleans was delivered, and that intended for further transit by way of export or otherwise was also delivered in carload lots over connecting tracks, or, where this could not be done, was hauled and delivered at the expense of the railway to the steamship or other carrier. Prior to 1873 the proof tended to show, at a point some six or eight miles above Gouldsboro, a spur track left the main track of the Texas and Pacific road, and extended for about half a mile in length to Westwego on the bank of the river. Before 1873, however, the proof showed that none of the inbound traffic was carried on at Westwego, though at that point probably some outbound freight, intended for the purposes of the railroad, may have been received at Westwego. Some time in 1873 the company constructed a grain elevator at Westwego, and built a terminal wharf at the same point. The proof gives no description of the elevator wharf, except that it was below the freight wharf and connected with it, but the freight wharf is fully described, there being no material variation in the testimony on the subject.

The wharf was built on the bank of the river. It was constructed on piles and stood above the water, the piling having placed on it beams and joists upon which planks were nailed, constituting a flooring which had very narrow spaces between the planks, as they were not tongued and grooved. The wharf was about 800 feet, stretching up and down the river front, and was somewhere between 350 to 400 feet in depth, that is, running back from the river front to where it rested against the bank. On this wharf were constructed two freight sheds, the one designated as No. 1 began some short distance above the lower end of the wharf, and extended up for a length of between 250 to 300 feet. At a short distance, above the upper end of this shed, the flooring on the wharf ceased, and there was an open space about 50 feet, extending up the wharf, and which was near about the width of the shed; in this place the piling had been driven and the joists and beams placed, but no flooring was laid. Beyond this open space there was built shed known as No. 2, of the same dimensions as the lower one. Both of these sheds were wooden structures raised on posts placed in the wharf, entirely open at each end and at each side. The roof commenced at about 20 feet above the flooring of the wharf, and was surmounted by a cupola running the entire length of each shed, which was covered with a lattice or wooden work like a wooden shutter. The number of the rows of posts in each shed is not made clear in the proof, but it tended to show that the posts were somewhere between 20 and 30 feet apart. About 8 to 10 feet in front of both of these sheds along the wharf was a railroad track, which entered the wharf from the lower end, and extended to and beyond the extreme upper end of shed No. 2. Between the outer rail of this track and the river front there was a space on the wharf of about 30 feet. Behind the sheds were two railroad tracks running the entire length, and extending above the upper end of No. 2 shed, somewhere between 50 and 100 feet.

Westwego was not within either the municipal limits of the city of New Orleans, or the limits of the port of New Orleans, as defined by statute. It was shown that the season of active cotton receipts in the city of New Orleans commences about

the first of September and ends about May of each year, and that the Westwego wharf was completed in time to enable the railway company to avail of its facilities for, if not the whole, at least a portion of the business of the cotton season of 1893 and 1894. After the construction of the wharf in the season in question the great bulk of cotton handled by the Texas and Pacific Railroad under export bills of lading was deflected from its main track at the Westwego spur track, carried to the terminal wharf, and there unloaded and transhipped. This the proof showed was the course of business also as to all export cotton in the following season of 1894 and 1895, up to the time of the fire, except, perhaps, as to small lots of cotton intended for export, where the number of bales would not justify the coming of a steamer to the wharf at Westwego, in which case the cotton was carried to Gouldsboro, transferred, and delivered. In arranging to carry export cotton the course of business was this: The Texas Pacific Railway would contract with steamship lines for the carrying of a given quantity of cotton at a stated price, and under these contracts would then, through either itself or through other carriers at various points of original shipment, issue through bills of lading, embracing both railroad and water carriage. The method pursued by the railway to bring about the formal delivery to the steamship lines of the export cotton at the Westwego wharf after its arrival is fully stated in the case of *Texas & Pacific Railway* v. *Clayton, supra.* It was shown that under the contracts made by the railway with the steamship companies there was always an understanding that the ships would not be obliged to suffer the expense of moving from their own docks, usually in the city of New Orleans, to the Westwego wharf, for the purpose of loading cotton, unless a sufficient amount, variously stated at from 1000 to 2500 bales, was on hand for delivery.

It appears that other railroads possessed terminal wharfs on the river, some of them being outside of the municipal and port limits, and that they were used as a depot for the shipment of through billed export cotton, under methods of business substantially similar to those at Westwego. The export cotton intended for transhipment at the Westwego wharf was

thus handled : On arriving in the vicinity, the cars were usually, in the night time, switched to the tracks running in the rear of the wharf beside the open sheds, and the cotton would then be unloaded and stored in the sheds, whence, when called for, it was delivered to the steamships. The track running the length of the wharf in front of the sheds was principally used for the bringing in of freight intended for shipment by water other than cotton. The cars containing it would be drawn or pushed by a locomotive along the track, and the freight would then be moved from the cars to the vessels.

During the cotton season of 1894 and 1895 (prior to November the 12th, 1894) labor troubles of a serious character occurred at the docks in the city of New Orleans. The disturbances, the proof tends to show, caused delay in the movement from the port of New Orleans of export cotton. Either because of this fact or because of an unusually large cotton crop, or an unexpectedly rapid movement of cotton to the seaboard by the Texas and Pacific lines, large quantities of export cotton accumulated in the sheds on the wharf at Westwego. The cotton, which was all compressed, was stored in the following manner: The bales were piled between 15 and 20 feet high throughout the whole space of the shed, but probably three, and certainly not more than four, narrow gangways being left in each shed, running from front to rear. There was no possible doubt from the evidence that no gangways were left running lengthwise of the sheds. There was also proof tending to show that these narrow gangways, as the cotton accumulated, were obstructed by bales of cotton standing endwise. The proof also tended to show that the accumulation of cotton became so great that on the river front of the sheds, in the open space towards the railroad track, cotton was also placed, approaching so close to the railroad track that as an engine moved along carrying or pushing cars containing freight intended for shipment there was not sufficient space between the cotton and the track to enable a person to stand with perfect safety. It appeared that around the open space between the upper end of the No. 1 and the lower end of the No. 2 shed cotton had been also piled. It was shown that most, if not all, of the cotton exposed as stated was

not covered with tarpaulins, and no other means were resorted to to protect it from the danger of fire arising from the operation of the locomotives in the rear and front of the sheds and among the cotton on the wharf.

Westwego was remote from any town or village having a police force or a fire department. The wharf exclusively belonged to the railway company, and was under its control; property on it, therefore, had the benefit of no police protection except that afforded by the company, and in case of fire had nothing to rely upon except the men and appliances which the company furnished. The fire appliances were as follows: There was a tank near the grain elevator standing at such a height as to afford adequate pressure. This tank was supplied by a pump drawing its water from the river. From the tank a pipe ran to the wharf and passed under the floor of each of the sheds. In each shed there were three hydrants or water pipes, in the middle of the shed—about equidistant; they were by the side of the posts, and stood six feet above the floor. On each of the six posts by which the hydrants stood and connected to them there was a platform six or more feet above the floor, on which was placed a hundred feet of coiled hose. A witness testified that some months or more before the fire he had seen hose stretched along the front posts of the shed resting on pieces nailed to such posts, but there was other testimony tending to give rise to the reasonable inference that no such hose was there at the time of the fire. The testimony on this subject, however, had no relation to the hose coiled on the platforms on or around the posts where the hydrants were situated. This is conclusively the case, since the witness who testified as to hose being stretched as above stated spoke only of the front, and said he had not observed the hydrants and their condition, and knew nothing of them. We say this in passing, because in the argument for the defendant in error it is suggested that the testimony of the witness in question related to the hose at the hydrants, and was all the testimony on the subject in the record, overlooking the clear and cumulative testimony that the hose, at the hydrants, was connected with them and coiled on a platform on or around the posts about six feet above the floor. The evidence left it

uncertain exactly where the valve was placed which opened the connection with the water. The proof tended to show that the valve was either under the floor with an opening to reach it, or just above it, at the base of the hydrant pipe. As the three hydrant pipes in each shed stood beside the posts, and the gangways running from front to rear, although very narrow, were shown not to be obstructed by the posts, it was therefore inferable from the proof that the posts where the hydrant pipes stood had cotton piled around them. Indeed, this inference was sustained by direct evidence tending to show that the posts near which the hydrants stood had cotton piled around them from twelve to fifteen feet high, and there was also proof tending to show that in some instances the cotton so piled had fallen over on the hose on the platform, and the bale which did so had to be removed.

There was testimony tending to show that along the front and rear of the sheds there were barrels containing water with buckets hanging near. It was shown without contradiction that there were no chemical fire engines, although there was testimony tending to show that what were designated as chemical fire buckets had been bought at about the time the wharf was built, and there was conflict in the testimony as to whether these buckets were on hand for use at the time of the fire. The evidence tended to show that no general directions as to handling or the use of the hose in case of fire had been given, that no fire drill had ever taken place, nor had the men in charge of the wharf been ever instructed in any way as to the use of the apparatus which has just been described.

The wharf in the day time was under the direct authority of an employé designated as chief clerk; in the night time it was in the charge of one regular employé of the company and three watchmen, who were the members of a special private police force in the city of New Orleans, the railway company contracting with the head of the special police organization for the services of the three men at the wharf, and a like number of men were on watch during the day time. In other words, in the night time the wharf was in charge of but four men, one a regular employé of the company, and three special policemen

employed as just stated, and their duty extended over the whole surface of the wharf and sheds, as well as under the wharf.

A short while prior to November 12, growing out of supposed danger resulting from fear of election disturbances, the force at the wharf was increased by a few men, whose duty it was to patrol the space under the wharf and prevent persons from entering by boats or otherwise. This force, prior to the fire, had been reduced to the number previously stated.

It was shown that at a wharf in the city of New Orleans belonging to a steamship company where cotton had accumulated, the force of watchmen employed was largely in excess of the number at Westwego, and that at a terminal wharf of another railroad, where there was about half the quantity of cotton which was on the wharf at Westwego at the time of the fire, there were twenty-five watchmen employed instead of four, the number at Westwego; that there were Babcock fire extinguishers, hose placed on reels ready for use, and that this hose was used almost daily for the purpose of washing down the wharves, and to enable the men in control to be familiar with its use in case of emergency.

By about the middle of October, 1894, the accumulation of cotton at the wharf of Westwego had been so great that the proof showed that the railroad officials had become solicitous on the subject, and deemed that they were in great risk of fire. It was also shown that about that date a destructive fire had occurred in a wharf where cotton was stored in the city of New Orleans, presumed to be the result of the labor disturbances, and that at Westwego, during the daytime, within a period not remote from the general conflagration which ensued, subsequently, the longshoremen working there had discovered a fire smouldering in a bale of compressed cotton which was in the tiers, and that it had been extinguished by throwing down the cotton and removing the bale; and that this fact had been reported to the officers of the company. Prior to Monday, the 12th of November, 1894, cars loaded with cotton were being brought in in the night time in the rear of the sheds, and for days prior to that date vessels had been loading in front of

both of the sheds, some with cotton and some with other products. On the 12th of November two steamers were at the wharf; one about abreast of the lower end of No. 1 shed, and the other opposite the upper or No. 2 shed; that for the purpose of bringing in the cargo taken by these ships, a locomotive was operating among the cotton on the wharf in front of the shed, and was passing back and forth on the track, pushing cars containing the freight to be loaded. Although there was some proof indicating that on that particular day the locomotive which entered from the lower end of the wharf proceeded up the track abreast of No. 2 shed, we assume, for the purposes of this opinion only, that it was shown that the locomotive was pushing so many cars ahead of her that she did not get abreast of the No. 2 shed. There was no proof that the locomotive, in operating along the front of the wharf, was emitting sparks from her smokestack or dropping cinders from her fire-box.

There was evidence as to the direction of the wind on the 12th of November. The parties asserting that opposing inferences were to be deduced therefrom, but without undertaking to consider this controversy, we assume only for the purpose of this opinion, that the result of this proof as to the direction of the wind tended alone to show that if a spark had been emitted from the locomotive operating on the front of the wharf, as above stated, the wind would have carried it away from the No. 2 shed, where the fire subsequently broke out, as we shall hereafter state.

On Monday, the 12th of November, 1894, the accumulation of cotton was so great that there were stored in the sheds and on the wharf in the manner which we have indicated, about 20,000 bales of compressed cotton, and there were in cars, standing on tracks in the vicinity of the wharf and sheds, about 8000 bales more, awaiting storage room. The cotton sued for was among the latter. On the evening of the date above mentioned, shortly after the day force had ceased work and the four night watchmen had come on duty, the cotton was discovered to be on fire. The flames spread rapidly, and a disastrous conflagration followed, with the result that most of the

cotton in the sheds and the sheds themselves, as well as cotton in the cars in the vicinity, among which was that sued for, was destroyed. What took place at the time of the discovery of the fire was testified to by only one witness, one of the night watchmen, Robeau, who was one of the three special officers of the private police agency. His statement of what occurred may be thus summarized: His place of duty was at the upper or No. 2 shed, and his business was to pass around and through the shed, and at designated intervals register his presence upon a watchman's clock. After sending a telephone message to indicate his presence at his post, and whilst he was on the river side of shed No. 2, at the lower end, he heard a cry of fire. Running immediately to a gangway, he crossed to the rear or wood side of the shed. Not seeing the fire, he ran up the rear side and across by a gangway to the river front, thence running along the river front of the shed he turned into another gangway and hastened towards the rear of the shed. In going through there he discovered Valle (the one of the four watchmen, who was the regular employé of the railroad company) standing on top of the piled cotton, about fifteen feet from the floor. Robeau joined Valle, who had the nozzle of a hose in his hand, from which no water was being thrown. From the place where the two stood on the piled cotton they saw a fire burning near the floor in the direction of the upper end of the shed. As they stood upon the pile of cotton they were above the hydrant pipe running up by the post, and about six feet above the platform around or upon the post, upon which was coiled the hundred feet of hose connected with the hydrant. From where they stood both the hydrant pipe and the platform with the coiled hose on it were hidden from their view by the piled cotton. Valle, holding the nozzle of the hose in his hand, from which no water was flowing, called upon Robeau to get down between the piles of cotton and open the water valve. Robeau squeezed himself through the space between the cotton piled around the post to the floor, felt about for the valve, perceived water on the floor, declared the valve to be open, and rejoined Valle. They both dragged at the hose, but no water flowed. The burning cotton flamed up, Valle called upon Ro-

beau to get down on the platform around the post and uncoil or untangle the hose. He refused on account of the intensity of the fire, and both became alarmed and ran away. The destruction of the property ensued.

As the only witness who testified concerning the outbreak of the fire, the alarm, and the efforts to extinguish it, was Robeau, and as therefore his testimony is of the utmost importance in determining whether the case should have been allowed to go to the jury, we excerpt in the margin[1] the portions of his testimony which are material.

---

[1] Q. Now go on and state what occurred. A. After we had done telephoning, and saw everything was all right, we came to the office—I mean to the office of the shed No. 1—to take my lamp, and I went to my beat, and I met the one that was there, and I said "How is it?" He told me "All right." I took off my coat and put my lamp away. Then I came to make my rounds as usual, to see if everything was right, where my key was. About five or six minutes I was standing there, or seven minutes; I can't tell exactly. I saw the private watchman pass. In about a minute or two I heard "Fire! Fire!"

By the COURT:

Q. You heard the cry of fire? A. The crying of "Fire! Fire!" I run to the woods side to see if I could see anybody, but I could not see anybody, and then I run to the river side, and then I run to the fire and I passed through the shed to go to the woods side and I saw Valle with hose in his hand, and he says, "Go down and open the valve."

Q. What did you do? A. I went to open the valve. I could only go sideways. I couldn't hardly stand; and I found the valve wide open. Then I came back and tried to help Mr. Valle with the hose in his hand. Everything was in flames. I couldn't do anything. I tried all my might to have the water, but we could not have any water. The hose was too heavy; we couldn't do anything at all; and he says to me, "Robeau, go down and untangle the hose." I says, "I won't go down where the flame is." I kept up; that is the only thing I could do. I went to the other end of my beat, and took my coat and ran away.

Q. Where did you first see the light of the flame that night? A. I was about 70 feet from the light.

Q. When you saw Valle did you first see the light of the flame? A. I saw Valle first.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. And when you first saw Valle, where was he? A. On top of the cotton.

Q. Whereabouts? A. About 12 or 15 feet high on top of the cotton.

By the COURT:

Q. Whereabouts on the wharf? A. At the woods side.

Such being the proof, was it sufficient to go to the jury? is the question then for decision.  In answering this question, as we have said at the outset, we shall be called to pass upon, not

---

By Mr. CLEVELAND:

Q. You were on the woods side?  A. Yes, sir.

Q. Where was Valle?  A. He was on the cotton.

Q. Whereabouts, with relation to the center of the shed?  A. The fire?

Q. No; where was Valle?  A. He was about the center of the shed, but the upper end; because the fire was about 70 or 75 feet below the upper end.

Q. When you first saw Valle what was he doing?  A. He had the hose in his hand.

Q. What was he doing with it?  A. He couldn't do nothing.  When I went down there he told me to go down and open the valve; and so I went, and it was wide open.

Q. When you were down there trying this faucet, and found that it was wide open, did you see any water coming out?  A. No, not a drop.  We couldn't have any water.

Q. You did not see any water when you were opening the valve?  A. Yes; saw the pouring.

Q. Leaking, you mean?  A. Yes.

Q. When you clambered up with Valle, and he had the hose in his hand, what part of the hose did he have in his hand?  A. The pipe.

Q. Was there any water coming out?  A. No, sir.

Q. What was he doing when you got up on that pile of cotton?  A. Tried to have water, but he could not have none.

Q. Was Valle on the hose?  A. Yes, and I was too; but everything was in flames; we couldn't do nothing at all.

Q. You say he said to you, "Go down and untangle that hose?"  A. Yes, sir.

Q. How do you mean go down?  Where was the hose?  A. The hose was pretty near where the fire was, against the post.

Q. Against the post?  A. Yes, sir.

Q. Was it on the platform?  A. On the floor.

Q. On the floor of the platform?  A. Yes.

Q. On the posts?  How high up from the floor of the dock?  A. The hose?

Q. Yes.  A. The hose was about six feet high.

Q. What did you do when you got up with Valle?  A. Tried to pull out the hose to have the water to extinguish the fire, but we could not.  Everything was in flames.

Q. When did you first see the flames that night?  Before you got up to Valle?  A. When I got on top I saw the flames.

Q. How many bales of cotton were on fire then, as you recollect it?  A. About three or four bales.

Opinion of the Court.

the preponderance of the evidence, but whether it was adequate to go to the jury; and this involves not a decision as to the facts, but the determination of a proposition of law.

---

Q. No water came out of the hose? A. No, sir.

Q. How long were you there pulling that hose, trying to untangle it? A. Maybe two or three seconds, because we tried the best we could.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. Describe to the jury this fire? Where was it? Was it on the top of the cotton or at the bottom? A. At the bottom of the floor.

Q. How near did you come to the flames that night, when you were nearest to them? A. About fifteen paces.

Q. In your judgment, if you had had a sufficient stream of water— A. We could easy put it out.

Q. Wait. In your judgment, if the water had come out of the hose that night—a full stream of water—such as the hose was able to carry, could you have extinguished the flames? A. Yes, sir; myself alone.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Cross-examination by Mr. TAGGART:

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. Where were you on the wharf when you first heard this cry of fire? A. I was about 30 feet under the shed, at the lower end.

Q. Towards No. 1 shed? A. Yes.

Q. On the river side? A. On the river side.

Q. That is out near the tug that was there? A. About 30 or 40 feet. I can't say exactly.

Q. Were you under the shed? A. Under the shed.

Q. Which way did you go when you heard the cry of fire? A. My idea first was to go to the woods side to see if I could see anybody.

Q. Were you at a gangway? A. Yes, sir.

Q. You went through that gangway then to the woods side? A. Yes, sir.

Q. And you saw nothing? A. I saw nothing. Then I run to the river side.

Q. Did you come back through the same gangway? A. No, sir.

Q. You went up along the woods then? A. I went to the upper end of my beat after I heard the noise, "Fire! Fire!"

Q. Did you go clear up to the upper end? A. Yes, sir.

Q. And you did not see any fire up there? A. No.

Q. Then where did you go? A. I went to the woods again. I went through the gangway, and I saw Valle.

Q. This hose he had in his hand, you say, did you? A. He had what?

Q. He had the hose pipe in his hand, did he? A. Yes, he had the pipe in his hand.

Q. How far was the hydrant from where he was? A. About 10 feet; but where he was he could not see the hydrant.

In *Washington Gas Light Company* v. *Lansden*, 172 U. S. 534, the question of the liability of the gas company for certain acts of its general manager, in respect to procuring the publi-

---

Q. He could not see the hydrant?    A. He was on top of the cotton.    He could not see me when I went down neither.

Q. What did you do when you went there?    A. I went there and I saw the valve was wide open.

Q. The what?    A. The valve of the pipe.

Q. And was there water in the hose?    A. Kind of water; yes, in the hose.

Q. It had pushed out in the hose, had it?    A. Yes, swelled up.

Q. How far had it pushed out and swelled up·in the hose?    A. I didn't look.    As soon as I saw it open I went to Valle to help him.

Q. What did you do to help him?    A. We tried to pull the hose free, and we couldn't do anything.

Q. The pressure of water had kinked the hose?    A. Yes, the hose was so tangled that we couldn't do·anything.    At the same time the blaze was going; and Valle says to me, "Go down and have it untangled."    And I said, "No, I won't go, go yourself if you want to."

Q. And you run away then, did you?    A. Yes, I did.    I tried to save my skin.

Q. This cotton was blazing?    A. Yes, very high.

Q. Blazing right up?    A. Yes.

Q. Blazing way up?    Yes.

Q. How high was it blazing when you got there?    A. About 6 feet from the floor—about.

Q. How high was the pile of cotton?    A. The cotton was piled about 15 feet high.

Q. Was it blazing along the side of that pile of cotton?    A. Yes, spread out.

Q. Spread out along the ends of the bales, was it?    A. Yes.

Q. Where was this kink in the hose—down below Valle?    A. Where the platform was?

Q. Yes.    A. About 6 feet under.

Q. You say the valve, when you tried it, was wide·open?    A. Yes, sir.

Q. How far out in this hose had the water pushed out from the pipe?    A. I don't know that.

Q. Did you take hold of the hose to .see?    A. With all my might, all the strength I had.

Q. And the pressure of water was so heavy that you could not straighten it out?    A. We couldn't budge it.

Q. Do you know who opened that valve?    A. I don't know.

Q. Do you know how high the fire was when that valve was opened?    A. Yes.

Q. How high was it when the valve was opened—when it was first opened?

cation of a libel, was presented for determination. In the course of the opinion, after observing that in the case no specific authority was pretended to have been given to the general manager on the subject, the court said (p. 545):

---

The COURT: He found it open.

The WITNESS: I found it open when I got there.

Q. You don't know who opened it?  A. No, I don't know who opened it.

Q. How long were you there with Valle when you discovered this fire?  A. I never took my watch for that.  I did the best I could.

Q. About how long were you there?  A. Maybe two or three seconds; I don't know.

Q. And then where did you go?  A. I went up stairs to help him.

Q. You went up on the cotton?  A. On the cotton.

Q. How long were you there with him?  A. Maybe one or two seconds.

Q. Then where did you go?  A. I said I tried to save myself.

Q. In saving yourself, where did you go?  A. I went to the lower end of my beat and took my overcoat and ran away.  I didn't stay any more.

   *  *  *  *  *  *  *  *

Q. Now, how long was it before the fire was spread all over the No. 2 shed?  A. About ten minutes.

Q. And about two seconds after you got there you had to run away on account of the fire, didn't you?  A. Yes.

Q. Do you know where the fire started?  A. Right in the center of the shed; I mean up the shed, about 40 or 50 feet this side.

Q. About 40 or 50 feet south of the upper end of No. 2 shed?  A. I can't say exactly.  About 70 feet, maybe.  I don't know.

Q. About that far from the upper end of No. 2 shed?  A. Yes, sir.

Q. And in the center of the shed, wasn't it?  A. Yes, sir.

Q. And near the bottom of a pile of cotton, wasn't it?  A. What?

Q. Was it near the bottom of the pile that it was burning?  A. At the floor, I told you, where it started.

Q. Was there a whole pile of cotton on fire?  A. When I got there I saw the light of the fire.

Q. Where did you see the light from?  Where were you when you saw the light of the fire?  A. Didn't I tell you that?

Q. No, you have not.  A. Didn't I tell you I was about 70 feet from the light of the fire?

Q. Was it in a gangway that the fire was?  A. Yes, sir.

Q. Were you at the end of the gangway when you saw the light?  A. I was on the platform outside.

Q. And did you see the light down the gangway?  A. Yes, sir.

Q. How much of a fire was there then, when you saw that?  A. I couldn't tell you.

Q. You did not see the fire?  A. Yes; when I came to climb up on the cotton, Valle says to me: "Go down and open the valve."

"We are then limited to an inquiry whether the evidence is sufficient upon which a jury might be permitted to base an inference that Leetch had the necessary authority to act for the company in this business. If different inferences might fairly be drawn from the evidence by reasonable men, then the jury should be permitted to choose for themselves. But if only one inference could be drawn from the evidence, and that is a want of authority, then the question is a legal one for the court to decide."

The court then reviewed the evidence on this branch of the case, and concluded as follows (p. 548):

"We are of opinion that the court erred in submitting to the

---

Q. I didn't ask that. I asked how much of a fire there was? A. I don't know.

Q. You did not see the fire? A. I saw the light of the fire.

Q. How much light was there: was it a big light? A. How much light was there?

Q. Yes; how much light did you see? A. I can't say exactly how much light I saw.

Q. Did you see it over the piles of cotton? A. No, sir; we couldn't see it.

Q. You could not see it over the piles of cotton? A. Because I passed there, about 15 paces from the places in the gangway.

Q. When? A. To come to Valle.

Q. And you did not see it in the other gangway, then, did you? A. No, of course not.

Q. You say this blaze was about 6 feet high when you got there? A. 6 or 7 feet high, yes.

Q. And how many bales of cotton was it covering? A. I don't know. I saw the light of the fire.

Q. I know, but when you got there?

The COURT: When you got there to Valle?

A. Three or four bales.

Q. Had it burned the covering off the bales? A. They were spread out.

Q. How wide was the fire; how wide was the blaze? A. About 15 or 20 feet I should say.

Q. Was it on the end of a solid bale of cotton? Was the pile of cotton solid there that it was burning against? Do you understand that? A. What do you mean?

Q. Was this cotton piled? A. Yes, like that.

Q. And was it burning 15 feet high? A. Yes, spreading.

Q. Spreading rapidly? A. Yes.

Q. How long was it from the time you heard Valle cry "fire" until you got to Valle? A. Maybe half a minute. I don't believe it was.

jury the question whether Leetch, in respect to the subject of the letters written by him to Brown, had authority to bind the company. The court should have directed a verdict for the corporation on the ground that there was an entire lack of evidence upon which to base a verdict against it."

In *Patton* v. *Texas & Pacific Railway Co.*, 179 U. S. 658, the following facts appeared: The action was brought by Patton to recover damages for injuries sustained while in the employ of the railway company as a fireman. On a second trial a verdict was directed for the defendant, upon which judgment was rendered, and the Court of Appeals affirmed such judgment.

Answering the contention of the plaintiff in error that the trial court erred in directing a verdict and in failing to leave the question of negligence to the jury, the court said (p. 659):

" That there are times when it is proper for a court to direct a verdict is clear. ' It is well settled that the court may withdraw a case from them altogether and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed, or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it. *Phœnix Ins. Co.* v. *Doster*, 106 U. S. 30, 32 ; *Griggs* v. *Huston*, 104 U. S. 553 ; *Randall* v. *Baltimore & Ohio Railroad*, 109 U. S. 478, 482 ; *Anderson County Commissioners* v. *Beal*, 113 U. S. 227, 241 ; *Schofield* v. *Chicago & St. Paul Railway Co.*, 114 U. S. 615, 618 ; *Delaware &c. Railroad* v. *Converse*, 139 U. S. 469, 472. See also *Aerkfetz* v. *Humphreys*, 145 U. S. 418 ; *Elliott* v. *Chicago, Milwaukee &c. Railway*, 150 U. S. 245.'

" It is undoubtedly true that cases are not to be lightly taken from the jury ; that jurors are the recognized triers of questions of fact, and that ordinarily negligence is so far a question of fact as to be properly submitted to and determined by them. *Richmond & Danville Railroad* v. *Powers*, 149 U. S. 43."

We come, then, to an analysis of the evidence for the purpose of ascertaining whether it was correctly decided that it afforded no reasonable ground upon which a jury, in the exercise of its

functions, could have inferred that the destruction of the cotton by fire was occasioned by the negligence of the defendant. In doing so we shall, of course, be mindful, as was said in *Patton* v. *Texas and Pacific Railway Company, supra,* that as both courts below have held that the evidence had not the tendency stated, their decision is entitled to great respect—a respect, however, which cannot relieve us from the duty of securing the plaintiffs in the enjoyment of their constitutional right to trial by jury if, in our opinion, the case made by them was one proper to be decided as one of fact by the jury, and not to be concluded as a matter of law by the court.

All the reasonable tendencies of the proof, if any, to show negligence, must arise from three propositions, which we shall proceed to consider in their order.

*First. The manner in which the cotton was stored and the operation of the locomotives in and about the same so as to subject the cotton to danger of fire and to cause the prompt detection of a fire to be so difficult as to render it practically impossible in time to prevent a conflagration.*

That the storage of such a great mass of cotton in the open sheds and on the wharf, with only a few narrow gangways from front to rear, with no passageways between the tiers running lengthwise of the sheds, so as to enable the cotton to be inspected and to be accessible upon an alarm of fire, with substantially no tarpaulins or other covering, and the operation of the locomotives in and around the open sheds and in front of the wharf among the cotton so situated at least afforded sufficient proof to go to the jury, we think is too clear for discussion. This was not controverted by either the trial court or the Circuit Court of Appeals, but the proposition which those courts felt constrained to uphold was, that as the proof did not in their opinion furnish any reasonable ground from which it could be inferred that the acts above enumerated had actually tended to produce the fire, therefore, even although there was negligence in the matters suggested, they furnished no reasonable ground upon which the jury could have given a verdict for the plaintiffs. This reasoning proceeded upon three assumptions, *a,* because the proof did not show that the locomotive

operating along the front of the wharf, on the morning of the 12th of November, had traversed the track opposite to or in the immediate vicinity of the place in No. 2 shed, where the fire occurred; *b,* because there was no proof that the locomotive was emitting sparks or dropping fire from its firebox, and if there had been, because the proof as to the direction of the wind showed that such sparks, if emitted, would have been blown away from the direction of the upper part of No. 2 shed where the fire broke out; and, *c,* because the fire was immediately discovered on its outbreak.

But each of these propositions either rests on premises of fact where no proof whatever existed or disregarded what the jury would have had the right to conclude was the reasonable tendency of the proof as made. There was no question that the proof showed, leaving aside the movement of the engine on the wharf on the morning of the 12th of November, that other locomotives had been moving in the rear of the wharf and in its vicinity probably on the night of the 11th, and certainly on the 10th, and previously; and the proof also unquestionably showed that for days prior to the breaking out of the fire, except it may be Sunday, vessels had been loading at the wharf in front of the No. 2 shed, and the tendency of the proof was to show that the cargo which they took was carried on the wharf in front of the shed by locomotives. To hold then that there was no proof tending to show that the conflagration was the result of · the movement of locomotives about and among the piles of exposed cotton, was simply to say such must have been the case because the proof did not tend to show that the fire could have been caused by the locomotive which was on the wharf on the morning of the 12th. This, however, was only to find, in the absence of all proof as to any other origin of the fire, that it would have been unreasonable for the jury to deduce the conclusion that the fire was the result of other and previous proximity of the locomotives to the cotton. The obvious danger resulting from the use of the locomotives, as described, in and about so easily ignitible a material as cotton, particularly when stored and unprotected as this was, is to our mind so clear that we think the least that can be said is, when

the origin of the fire was otherwise unexplained, that the jury would have been reasonably justified in drawing the inference that the use of the locomotives caused the fire. And the general course of legislation, both in England and this country, demonstrates the soundness of this conclusion. *St. Louis & San Francisco Railroad* v. *Matthews*, 165 U. S. 1. The only possible ground by which this can be met is the assumption that because there was no proof tending to show the operation of a locomotive in the rear of the sheds or on the front of No. 2 shed, for a considerable period of time before the fire, therefore sparks from the locomotive could not have caused the fire, because if they had the conflagration would have broken out sooner. But this assumes that compressed cotton, piled up as this was, if ignited by sparks, would necessarily at once break out into flame, and disregards the right to have the judgment of the jury as to whether the fibre of such cotton, when so situated, on being touched by a spark, might not have smouldered for a considerable time, until such headway had been gained as to cause the fire to break into flame. In other words, there being two inferences to be drawn from the testimony, one of a sudden outbreak of the fire and the other of a long continued smouldering, it was the province of the jury to pass upon the question. And this disposes of the assumption that the fire was discovered immediately on its breaking out. Such assumption, however, was a mere unreasonable inference from the facts in favor of the defendant and against the plaintiff, and rested on the predicate that there was nothing in the proof which would have justified a jury, although the cotton was compressed and piled up, in inferring that the fire might have smouldered for a considerable time before bursting into flame. It was certainly open to the plaintiff to direct the attention of the jury to the obvious natural law that any fibrous material, like cotton, when tightly compressed and piled, as was the cotton in question, if ignited by a spark, may smoulder for an uncertain period. The only proof on the subject of the discovery of the fire is that to which we have referred, giving an account of the alarm of fire by Valle. The mere fact, however, that he gave an alarm of fire when he discovered it does not sup-

port the inference that the fire had not been burning for a considerable period before he knew of it.   Indeed, when the state of the fire, as described by the witness Robeau when he first saw it, is taken into consideration, and the natural tendency of a tightly compressed fibre to smoulder is borne in mind, the jury might have reasonably inferred, we think, from the condition of the fire when first seen by Robeau and the rapid and extensive conflagration which almost immediately resulted, that the discovery marked, not the time when the ignition of the cotton took place, but the breaking out of the cotton into a flame as a consequence of its prior burning.   This also disposes of the view that although the cotton was negligently stored by leaving no gangways through the length of it, by which it could be inspected and the presence of fire be promptly detected, the proof did not tend to justify a recovery because the fire was discovered in the mass of cotton just as soon as it would have been if proper precautions had been taken in its storage.   The description of the state of the fire, we think, afforded ground for a jury to otherwise find, for the only proof on the subject was, that in order to discover the fire, the watchmen had to climb up on the pile of cotton, and that it was not possible, from the gangway, to have seen the fire, as it would have been if suitable openings length wise had been left.

*Second. That the proof showed negligence in the care of the property inasmuch as the number of watchmen who were engaged were greatly inadequate for the service, and therefore the jury would have been reasonably justified in finding that the destruction of the cotton was occasioned thereby.*

Here also we think it was evident that the presence of only four watchmen to care for so vast an accumulation of cotton stored and exposed to the risks it was subjected to was sufficient to go the jury on the question of negligence.   Both the courts below with reference to this ground substantially concluded, as they did as to the former one, that even although the number of watchmen was insufficient, nevertheless as the inadequate number of watchmen discovered the fire as soon as it broke out, a greater number of watchmen could have done no more,

therefore the inference of negligence contributing to the loss was as a matter of law unwarranted. This, however, but rested on the assumption that the fire was immediately discovered. On the contrary, as we have said, not only the reasonable inference that cotton stored and piled like that here in question, when ignited, would smoulder, but the actual facts as to the conflagration in hand, we think, were sufficient to go to the jury so as to enable the jury to conclude whether, if an adequate force of watchmen had been on hand, the fire might have been sooner detected and the property saved from destruction. But the larger number of watchmen would have been efficient, not only in detecting the fire, but for the purpose, in such an emergency, of handling the cotton in order that the fire might be gotten at and extinguished. That an adequate force might have so done was reasonable to infer, especially in view of the proof that in the daylight, when a larger body of men were at work, smouldering cotton was discovered in one of the lower bales, and by removing the others and getting at the ignited bale in a tier, a conflagration was prevented.

*Third. That the jury would have had reasonable ground to infer negligence from the inadequacy of the fire apparatus and from the want of instructions as to its use or competent men to handle it.*

This proposition, we think, is also well founded. The argument to the contrary is, that as it was shown that if the apparatus which was there had been properly worked, the fire would have been extinguished ; therefore there was no negligence in respect to such appliances. The proof was construed to be that when Robeau heard the alarm of fire and rushed to the point where Valle stood, upon the cotton, and was ordered by Valle to go down and open the valve, he found the valve open, because Valle had previously opened it. But we have searched the record in vain for any direct proof that Valle had opened the valve before Robeau's arrival. *Non constat*, therefore, that the valve had not been left open negligently some time previously, as it was hid from view by the cotton, and if the open valve therefore caused the tangling of the hose or

rendered it so that it could not be moved, the negligence in respect to the care of the hose would be that of the company. If it be that one inference from the testimony would have justified the conclusion that Valle had opened the valve, as such inference was not necessarily to be drawn, then it was the function of the jury and not of the court to draw the proper inference.

But this, it is argued, is of no consequence since, it is asserted, the proof showed that the cause of the destruction of the cotton was not the imperfect nature of the appliances, but an error of judgment in the use of them by the employés in the emergency of the moment. The proof, it is insisted, left no room for any other inference than that Valle on the discovery of the fire had rushed to the spot, thrown the hose down from the platform, got down among the cotton and opened the valve, or had left the hose on the platform without unwinding it, and that the pressure of water had either so kinked or tangled the hose when thrown down or rendered it so difficult to move it, if left coiled on the platform, that the water would not flow, and the failure to extinguish the fire resulted. But all the elements contained in these propositions involve mere inferences from the evidence which it was the province of the jury to make. The only testimony in the case showing the actual condition of the hose at the time of the discovery of the fire was that of Robeau. That testimony showed that the cotton was piled up around the post where the hydrant was situated, above the platform on which the hose was coiled, to such an extent that neither the hydrant nor the hose could be seen from the gangway or from the top of the pile of cotton, that to get at the hose, if it was on the platform, required either reaching to or getting on the platform about six feet below, between the cotton, and to reach the valve necessitated squeezing down between the cotton to the floor. Under these circumstances and the difficulties which they necessarily created we think the proof was such as would have reasonably justified the jury in concluding that the negligent acts of stowing the cotton high up around the hose and the hydrant and the valve connected with it created a condition so conducing to error of judgment and misdirected efforts as to

render the railway company responsible therefor. And this conclusion is greatly fortified when the uncontradicted proof is considered that no general rules for the use of the fire apparatus had ever been promulgated, that no systematic inspection thereof had been made, that no fire drill or instructions as to the use of the apparatus was had or given, and that the too few watchmen were left in case of an emergency to use an apparatus which, even if it were intrinsically adequate, was surrounded by the act of the company with such conditions that its favorable and efficient use was rendered practically impossible.

This leaves for consideration only the question whether the case should have been allowed to go to the jury on the question of deviation. As the result of the conclusions to which we have come on the question of negligence is that a new trial must be granted, it follows that on the new trial the whole case will be open. Being so open, we cannot say that testimony may not be introduced at the new trial which may modify the aspect of this question as exhibited in the record now before us. Conducive, however, to the result that there may be an end to this litigation, we content ourselves on this branch of the case at this time with saying that we think the proof in this record fully justified the action of the trial court in respect to the question of deviation.

*The judgments must be reversed and the cause remanded to the Circuit Court of the United States for the Southern District of New York with directions to set aside the verdict and grant a new trial, and it is so ordered.*