## PAYNE v. MUTUAL LIFE INS. CO. OF NEW YORK.

### (Circuit Court of Appeals, Eighth Circuit.  October 9, 1905.)

### No. 2,026.

**1. INSURANCE—ACTION ON LIFE POLICY—QUESTIONS FOR JURY.**

In an action on a life insurance policy, it was shown that, while soliciting agents were required to settle for the net first premium on each policy written by them in cash, it was a practice recognized by the company to permit them, on their own responsibility and at their own risk, to advance such net premium, making such arrangement as they saw fit with the insured. The policy in suit was issued by the company, sent to its general state manager, and by him given to the soliciting agent who took the application, to be delivered to the insured on payment of the first premium. The agent afterwards paid in the premium, less his commission, and it was received by defendant. The insured died within the year covered by such premium. The agent testified that the application, which was made at the end of the year, was taken solely to increase the apparent amount of business done by him during the year, to enable him to obtain a prize offered by the company; that he paid the net premium, and it was agreed between him and the insured that she should·pay nothing, but that he should retain the policy and at the end of the year permit it to apparently lapse. There was evidence on behalf of plaintiff tending to show that the agent had solicited the application several months previously, and that when it was made insured and her husband signed a note to the agent for the premium, due in one year, but were assured by him that, if they were not able, it need not be paid at that time, and that if they desired they could then reduce the amount of the policy. *Held*, that such evidence was sufficient to require the submission of the question of the bona fides of the contract to the jury.

**2. SAME—DELIVERY OF POLICY.**

·· Where it was a common practice recognized by a life insurance company to permit soliciting agents to advance the first premium on applications taken by them, taking notes of the insured or otherwise securing themselves for its repayment, the delivery of a policy to such an agent, who paid the premium and took a note therefor from the insured, constituted a complete delivery as between the company and the insured.·

[Ed. Note.—For cases in point, see vol. 28, Cent. Dig. Insurance, §§ 226, 1856.]

**3. BILLS AND NOTES—VALIDITY OF NOTE—VARYING CONTRACT BY PAROL AGREEMENT.**

The binding obligation of a note cannot be affected by a contemporaneous parol agreement that it need not be paid.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 1802.]

In Error to the Circuit Court of the United States for the District of Utah.

E. B. Critchlow (H. P. Henderson, Frank Pierce, and W. J. Barrette, on the brief), for plaintiff in error.

Edward M. Allison, Jr. (Geo. Sutherland and Waldemar Van Cott, on the brief), for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge.  This was an action on a policy of life insurance for $10,000, alleged to have been executed and delivered on December 28, 1901, by the defendant, a corporation of the state

of New York, to Harriet A. Payne, a citizen of the state of Utah, insuring her life for the benefit of her personal representatives. The execution and transmission of the policy to one Rulon S. Wells, the general manager of the company for the state of Utah; the receipt by the company from its soliciting agent of the net premium, that is to say, the premium as fixed by the policy, less the agent's commission for the first year; and the death of the insured within the year—are admitted by the company. The defense is that the policy was not a contract, but was the result of a scheme entered into between the soliciting agent and the insured to deceive the company by making it falsely appear that the soliciting agent had secured a larger amount of insurance than any other agent in the state of Utah, and for that reason would be entitled to a certain prize which the company had offered to agents in that state. Certain issues of fact were tendered by the defendant in its answer, upon which the case went to trial in the court below. These were that it was understood and agreed between the soliciting agent and the insured at the time the policy was applied for that the insured should not pay, or be in any manner liable for the payment of, either the first or subsequently maturing premiums on the policy; that the policy, when issued by the company at its home office in New York and forwarded to its general manager in Utah for delivery, should never be in fact delivered to the insured, but should be held by the agent for the ultimate purpose of securing a prize, and then allowed to lapse; and that the insured, or her estate, should never have any interest in the policy, but as to them the same should be void and of no effect. The case was tried below on these issues, and at the conclusion of all the evidence, upon motion of defendant's counsel, the learned trial judge instructed the jury to return a verdict for the defendant, which was accordingly done.

The main ground urged for a reversal of the judgment rendered on the verdict is that the court erred in not leaving the issues to the jury for determination. To this we will first give attention. It is a settled law, that:

"When the evidence given at the trial with all inferences that the jury could justifiably draw from it is insufficient to support a verdict for plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant." Louisville, etc., Railroad Co. v. Woodson, 134 U. S. 614, 621, 10 Sup. Ct. 628, 33 L. Ed. 1032.

The principle last announced is fully recognized and has been expressed in various ways, such as:

"Where the evidence is undisputed or is of such a conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict in opposition to it, the court may direct a verdict." Marande v. Texas & Pacific Railway Co., 184 U. S. 173, 191, 22 Sup. Ct. 340, 46 L. Ed. 487. See, also, Delaware, etc., Railroad v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213.

The general rule is clear, and it now becomes necessary to examine the record with a view of ascertaining whether there is any substantial evidence upon which the jury, in the exercise of its proper

function, might have found for the plaintiff on the issues presented in the case.

Certain facts are undisputed. The policy was issued by the company at its home office in New York and transmitted to Rulon S. Wells, the general manager of defendant, in Salt Lake City. Pursuant to an established custom of business, he delivered the policy to one E. L. Chesney, the agent who originally solicited it, with the intent and purpose that he should deliver it to the insured and collect the first year's premium. This premium, as stated in the policy, is $378.70. Of this sum the soliciting agent at the time was entitled,· for his commission and some special bonus, to $284.02, leaving $94.68 as the net premium due the company on this policy. In due time after receiving the policy Chesney paid the general manager the net premium of $94.68 due the company, and this ended the transaction so far as the company was concerned. It had issued its policy and delivered it to Chesney for delivery by him to the insured and collection of the premium. The premium due the company had been paid.

In dealing with his sub or soliciting agents General Manager Wells observed a common practice of requiring the soliciting agents to do a cash business with the company, but permitted them to make such arrangements for the payment of first premiums by the insured as suited the convenience of both, whether by way of taking notes or extending time of payment of the whole or any part of the premium. The general manager in his testimony admits that it was common practice to have notes taken by soliciting agents ·in payment of first premiums, in his office, not for collection exactly, but as collateral security for the payment of advances made to soliciting agents. He says he frequently turned over the notes to the soliciting agent who deposited them for collection by him; that they remained the property of the agent at all times, subject to the payment of the agent's account. He further says, in substance, that the first year's premium on the policy in question was settled, so far as the company was concerned, by cash paid by Chesney, and that the note taken by Chesney was not turned in to him; that after Chesney had made the payment of $94.68, the net premium due the company on the policy in suit, the company had no further claim against anyone for the first premium. It may therefore confidently be assumed that the company was well aware of the fact that in the usual course of business Chesney might take the note of Mrs. Payne for the whole or part of her first year's premium, and might make any other arrangement with her concerning the matter which he desired to do, provided, only. he paid the company, through its general manager, the net amount due it as the first premium on the policy.

Now what did Chesney do? He testifies, in substance, that he first broached the question of Mrs. Payne taking a policy in his company, on December 28, 1901; that he made arrangement with her husband the day before to have her come from Syracuse, her home, to Salt Lake City on the next day, and when she arrived there his account of what occurred is as follows:

"I told her that there was a contest on for a prize of a gold watch, to be given to the agent writing the most business, taking in the most applications and paying for them, and up to that time I thought I was in the lead and had secured the watch, but found that I was behind and wanted to know if she would be examined, so that I could present the application and get the watch, and she was inclined not to be examined. * * * She said she did not want to, because she did not have any money to pay and did not want any insurance to pay for. I told her it would not be necessary to pay out anything, as I would pay out the money to be paid; that it was a favor from her to me, that I might win the watch; and that there would not be anything needed down. * * * Well, she argued for quite a long while. I don't remember the whole of the conversation, but finally she said she would be examined upon that basis that she did not have to pay any money."

Witness Chesney further tesified, in substance, that he then, December 28, 1901, wrote the application; that Mrs. Payne never paid anything to him for the insurance; that Mr. and Mrs. Payne never gave him any note for the premium; that he never had any conversation with her about the premium or about the cost of the policy. His testimony makes a clear showing that the taking of the policy by the insured was a mere favor to him to aid him in his contest.

But this is not all the evidence. Mr. Payne, the husband of the insured, testifies in answer to questions as follows:

"Q. What did he (Chesney) say to you and to your wife? A. Well, he wanted me to let her take insurance out. I told him I did not feel able for to take one out on her now; that I wanted to wait and see how we came out with the salt. We had not yet raised our crop of salt. Q. What answer was made to that, or what did he (Chesney) say? A. Well, it went on for a while, and he kept after us for to take a policy out—for her to take a policy out. Q. During what period of the year? A. Well, that is from about May, I should judge, last of May right along up to the time she did take one out. Q. What did you say to him, if anything, definitely about what would be done in the way of taking out insurance for her with regard to the salt crop or prospect of it? A. I told him * * * I would not take out one until I saw how we was going to come out on the salt crop, and then if we were able we would take one out on her."

Margaret Payne, a daughter of the insured, testifies to the effect that Chesney had a conversation with her in October, 1901, about the application for life insurance by her mother. She testifies that about the middle of October, 1901, Chesney said to her that he had just been up and had her mother sign an application for a policy of life insurance.

There is, therefore, a sharp conflict of evidence between Chesney on one hand, and other witnesses, as to when he first approached Mrs. Payne for insurance. He testifies emphatically that nothing of that kind was done until December 28, 1901. There is certainly some evidence that Chesney was endeavoring to secure a policy on her life in the usual course a long time before the exigency of the prize contest required it. There is also a conflict of evidence on the question of fact whether any payment of the first year's premium was made or agreed to be made by the insured. Chesney, as already observed, says Mrs. Payne paid nothing, and assumed no obligation to pay anything, but, on the contrary, that it was expressly understood that she should pay nothing. Mr. Payne, the husband, after narrating how, at the instance of Chesney, he got his wife to go from

Syracuse to Salt Lake City on December 28, 1901, and how she went into the doctor's office to be examined, gives a detailed account of his signing, with his wife, a paper for what he says was "370 something," payable to E. L. Chesney, maturing one year after date. He seems, from his evidence, to be inexperienced and unfamiliar with business affairs, and somewhat ignorant concerning the meaning of the transaction in which he was engaged. His evidence, too, impresses us as that of a witness extremely careful to say nothing more than he remembered and in no sense a willing or officious one. While he cannot remember or state the terms of the paper signed by him and his wife, except in the particular above referred to, he testifies that Chesney, when he asked him to sign the paper, said:

"It was a note that my wife had given him, and I had to sign with her, in order for her to get this policy."

This note, according to the evidence, was then delivered to Chesney and has not since made its appearance.

The following further evidence of the husband, in questions and answers, is given in detail for special reasons which will appear later:

"Well, he (Chesney) said it was a note my wife had signed, and I would have to sign in order to get this; but as far as I was concerned, if I did not feel like paying for that at the end of the year, I did not need to. Q. Pay for what? A. Pay off this note that we had signed. There would be no need to if we did not feel like it. If we did not feel able at the end of that year, that we had no need to pay for it, that he would— * * * As to the policy, he said, after this had run a year, if we did not feel able to pack this amount, we could cut it down at the end of the year, and take what we could. We was speaking about the amount that we was taking out; that we did not know whether we would be able to pay it or not. * * * Well, I told him like this: We was kind of in trouble with the Inland Salt Company. They had a suit against us, and we did not know really how we was coming out. I spoke to him about it. I did not know how we would come out on that suit, nor what we would make out of the salt crop. Q. What did he say to you in reply to that? A. He said, if we was not able to pay this, pack this much insurance, we could cut it down, take what we could."

This and other like evidence seems to us so natural, candid, and ingenuous, so expressive of the doubts and uncertainties which ignorant or poor people feel about in incurring obligations, that we have no hesitation in saying that it, with the reasonable inferences naturally arising from it, affords some substantial evidence that the insured gave a note to the soliciting agent for the full amount of the first year's premium, and thereby obligated herself and husband to the payment of the same in full. There being evidence as already seen, that the subject of insuring Mrs. Payne had been under consideration for several months before the question of securing the prize by Chesney became acute, and that a note was given by herself and husband for the payment of the first year's premiums, all in accordance with permissible practice as shown by the custom of the business conducted by defendant company in the state of Utah, we think there is substantial evidence that the transaction in question was honest, and intended in good faith by the parties as a contract of insurance, and not as a device to deceive the company as charged in defendant's answer. It is not for us to weigh the evidence pro and con on the issues

presented. It is sufficient for our present purpose to determine that there is substantial evidence which, with the fair inferences deducible therefrom, would support a verdict, had one been found in favor of the plaintiff.

The argument is made by plaintiff's counsel that, if the soliciting agent paid the first year's premium, even without the authority of the insured, the company would be liable. This we do not feel called upon, under the issues presented by the pleadings, to consider. It is a moot question only. The evidence discloses beyond question that the soliciting agent paid the defendant company all that, as between him and the company, was due the latter; in other words, that he paid the full net first year's premium to the company. He paid this sum to the company, either in execution of the fraudulent scheme set forth in the answer, or as an advance for the account of Mrs. Payne, evidenced by the note alleged to have been taken by him. These are the only two theories presented by the case. In the event first mentioned, it is conceded that no liability would attach to the company; in the event next mentioned, it must be conceded that liability would attach. The evidence discloses a common practice recognized by the company, permitting soliciting agents, upon their own responsibility and at their own risk, to make such advances, and no point is made in argument or brief against its binding the company.

It is hardly necessary to advert to the contention that there was no consummated delivery of the policy in question to the insured. If the whole transaction was a fraudulent device, participated in by the insured, as claimed by the defendant, and if it was understood and agreed that no premium should be paid or obligation assumed by the insured with respect thereto, but that Chesney should hold the policy for his own purposes, and apparently allow it to lapse after his purposes should be accomplished, in such case, his possession of the policy was clearly his own, and not that of Mrs. Payne, the insured. If, on the contrary, the parties intended a bona fide contract of insurance, and Chesney, in the usual and permissible course of business, paid the premium for Mrs. Payne pursuant to an arrangement by which he took her note, giving her a year's time to refund it to him, then his possesssion of the policy was her possession, and the delivery as between the company and herself was complete. The general manager testifies that in the usual course of business the delivery by the company of a policy to the soliciting agent was for the purpose of collecting the premium and delivering the policy to the insured. If the premium was collected from the insured, the title of the policy immediately vested in her. The last-mentioned contention will therefore depend upon the determination of the main issue of fact in this case. Was the transaction as made intended as a bona fide contract of insurance, the premium being paid by Chesney for account of Mrs Payne, as claimed by the plaintiff, or was it a scheme or device to fraudulently secure a prize as claimed by the defendant?

It is next urged that the note, if given to Chesney, as claimed, with the understanding indicated by Mr. Payne's testimony, was not an enforceable obligation, and hence has no force or effect in the case.

That testimony may admit of one or more interpretations, dependent upon the meaning of the language employed in the light of local usage. A peculiar dialect or provincialism is apparent. The statement of the witness at one time is, in substance, that Chesney told him that they need not pay the note unless they felt like it, unless at the end of the year they felt able; that, if they did not feel able to do it, "he would,"—do something. What, is left unsaid. In the same connection, witness Payne says Chesney told them, if they did not feel able to pack the full amount of insurance, they could cut it down at the end of the year. This language is probably subject to explanation, and might have been understood by the jury to mean that if, at the end of the year, they were unable to carry the full amount of $10,000 insurance, they might reduce it and make other arrangements in harmony with their circumstances, or that, if they were unable to pay their note at the end of the year, other arrangements in the nature of an extension might be made. If such is the purport and meaning of the testimony, it obviously affords no ground for impeachment of the validity of the policy. This testimony should all have been submitted to the jury for its interpretation and consideration in the light of all the other facts of the case, under proper instructions of the court. If the testimony, taken all together, means that the makers need not pay the note at all if they did not feel disposed to do so, such cotemporaneous parol contradiction of the express written obligation would be void and of no effect. Brown v. Wiley, 20 How. 442, 15 L. Ed. 965; Brown v. Spofford, 95 U. S. 474, 24 L. Ed. 508; Martin v. Cole, 104 U. S. 30, 26 L. Ed. 647; Burnes v. Scott, 117 U. S. 582, 6 Sup. Ct. 865, 29 L. Ed. 991; Falk v. Moebs, 127 U. S. 597, 8 Sup. Ct. 1319, 32 L. Ed. 266.

The case of Burke v. Dulaney, 153 U. S. 228, 14 Sup. Ct. 816, 38 L. Ed. 698, is relied upon by defendant's counsel; but a careful consideration of the facts and doctrine of that case discloses no applicability to the case before us. Defendant in that case was sued on a note which he admitted to have given plaintiff. He offered to prove as a defense that at the time of the giving of the note and prior thereto, the plaintiff (the payee) agreed with him that the note should be given to represent the price of the interest which defendant was to have in certain mining property, conditioned upon his demanding such interest after an inspection of the mining property. He further offered to prove that, after inspecting and testing the property, he notified plaintiff that he did not want it, and demanded the redelivery of the note to him. This evidence was excluded by the trial court. The court in its opinion announced the general rule already referred to concerning the involability of written contracts, and then stated that the evidence offered and rejected did not in any true sense contradict the terms of the note itself, "but tended to show that the written instrument was never in fact delivered as a present contract, unconditionally binding the obligor according to its terms from the time of such delivery, but was left in the hands of Dulaney [the payee], to become an absolute obligation of the maker in the event of his electing, upon examination or investigation, to take the stipulated interest in the property." In other words the Supreme Court said:

"According to the evidence offered and excluded, the written instrument upon which this suit is based was not, except in a named contingency, to become a contract as a promissory note which the payee could at any time rightfully transfer."

There is, in our opinion, no evidence in this record which brings this within the doctrine of that case. The evidence of Mr. Payne, in our opinion, can be construed in one of two ways only—either that Chesney told him that they (Mr. and Mrs. Payne) would never be called upon to pay the note at all, in which case there would be a flat and ineffectual contradiction of the terms of the note itself, or that, if they were not able to meet the payment at the end of the year, other satisfactory arrangements would then be made. There is no phase of the evidence, as we understand it, warranting the conclusion or inference that the parties understood the note was conditionally delivered, or was to be obligatory only upon the happening of certain future events. If the note was given at all, it was, under the evidence as we understand it and authorities already cited, an unconditional obligation, with some friendly and personal assurance as to what might be done if the makers were unable to meet the payment when due. Inasmuch as this case must be reversed, because of the peremptory instruction to find in favor of the defendant, we have not deemed it advisable to review the action of the trial court in excluding evidence offered by plaintiff, as presented by many of the assignments of error. It is not doubted that the learned trial judge will, in the light of this opinion, be able at the next trial to make proper rulings as to the admission and rejection of evidence.

The judgment will be reversed, with a direction to the court below to grant a new trial.