No. 4542.

(Court of Appeal, Parish of Orleans).

**MENTE & CO. vs. ILLINOIS CENTRAL R. R. CO.**

Dart & Kernan for plaintiff and appellant.

Gus Lemle for defendant and appellee.

GODCHAUX, J.—About 5 o'clock on the afternoon of Saturday, December 22, 1906, plaintiff sent down to the receiving depot of the defendant company a dray load of burlap bags consisting of thirty-four (34) bundles, admitted to be worth $584.14. Coincident with the arrival of these goods, the defendant received written and oral instructions from Mente & Company that this load was the first installment or portion of a lot of two hundred odd bags to be consigned and to go forward as a single carload shipment to H. L. Halliday Milling Company, Cairo, Ill. Under these conditions, the thirty-four bundles were delivered to the defendant railroad, and, whilst being thus held by it in its receiving depot or warehouse awaiting the delivery by Mente & Company of the remaining bundles required to constitute the full carload

lot or shipment, they were destroyed by fire on Sunday evening, December 23, 1906.

This suit is for the recovery of the value of the bags thus destroyed and the railroad rests its defense upon the proposition that the bags having been in its custody as a warehouseman at the time of their destruction, and no negligence upon its part having been exhibited, it cannot be held liable. It frankly admits, however, that if the Court should hold that its custody of the bags at that time was that of a common carrier, then the proof is such that its liability for the amount demanded must be decreed.

The first question, consequently, that should be considered is whether the custody of the defendant, at the time of the loss, was that of a common carrier or merely that of a warehouseman.

## I.

The general rule fixing the time when a railroad's responsibility as common carrier attaches to goods delivered into its custody for transportation is announced as follows:

"The liability of a common carrier for goods received by him begins as soon as they are delivered to him, his agents or servants, at the place appointed or provided for their reception when they are in a fit and proper condition and ready for immediate transportation. * * * But, on the contrary, if the goods, when so deposited, are not ready for immediate transportation, and the carrier cannot make arrangements for their carriage to the place of destination until something further is done, or some further direction is given or communication made concerning them by the owner, or consignor, the deposit must be considered to be in the meantime for his

— 155 —

convenience and accomodation, and the receiver, until some change takes place, will be responsible only as a warehouseman. The party bringing the goods must first do whatever is essential to enable the carrier to commence, or to make needful preparations for commencing, the service required of him before he can be made liable or subjected to responsibility in that capacity. * * * The duties and obligations of the common carrier with respect to the goods commences with their delivery to him, and this delivery must be complete, so as to put upon him the exclusive duty of seeing to their safety.''

> Cited from **Moore on Carriers, p. 130, par. 1;** see **Hutchinson on Carriers, p. 107, sec. 112; Elliott on Railroads, Vol. 4, Secs. 1403, 1409, 1464 Angell on Carriers, Secs. 131 and 134; Stoey on Bailments, Secs. 535, 536, 537; Shouler on Bailments and Carriers, Sec. 390; Rorer on Railroads, pp. 1279 and 1282; 6 Cyc. 414 and 453; 5 A. & E. Ency. of Law, pp. 261 and 262.**

Applying the foregoing principles to the present case it appears clear to the Court that the responsibility as common carrier had not attached with respect to the goods at the time of their destruction, for they had not been delivered to nor were they in the custody of the railroad for immediate shipment. On the contrary, they were to be held, according to plaintiff's instructions, until the entire carload should be delivered; and the service of transportation could not commence on the part of the railroad until the full delivery was accomplished. The determination of the period when a railroad's duty as carrier commences is not dependent upon whether the goods were being held to await the convenience of the shipper or of the railroad, and it may be admitted that a shipment by carload is to the advantage equally of each

of these parties. The true test of whether the custody of a railroad is that of a common carrier as distinguished from that of a warehouseman, is whether or not the delivery was so made that the carrier could undertake at once, without awaiting further action on the part of the shipper, its service of actual transportation. While extreme duties and responsibility are properly imposed upon common carriers, it is equally proper that the application of these extreme duties and responsibility should not be so extended as to embrace the custody of property as to which its relationship of common carrier has not as yet attached.

This doctrine has been announced and applied in innumerable cases, but only one has been called to our attention in which the facts are exactly similar to the present case. This is the case of **Watts vs. Railroad, 106 Mass. 466**, where the Court reached the same conclusion as we announce.

      See, also, **Missouri Pacific R. R. vs. Riggs, 62 Pac. Rep. (Kan.) 712.**

The case of **Roth vs. The Brigg Terry, 18 An. 705**, has been cited by plaintiff as announcing a contrary rule. The opinion in that case, in so far as it affects the issues here, is purely **obiter;** and moreover, a careful reading of the facts recited in the opinion leaves in doubt not only the vital point as to whether or not the whole shipment had been delivered at a time prior to the loss, but also whether or not the contract between the shipper and the carrier embraced a fixed and determined number of bales.

Article 2752 of the Revised Civil Code, which has likewise been cited by the plaintiff as announcing a contrary doctrine, has application in that it simply announces what is a rule of general jurisprudence, to the effect that the custody of a railroad, in its capacity as carrier, is not postponed until the goods are deposited in its vessel

or carriage, but attaches as soon as the goods have been delivered at the place of deposit provided by the carrier.

The Court holds that the custody of the defendant in this instance was that of a warehouseman, and not that of a common carrier.

## II.

As the liability of the defendant was not that of a carrier, it was not necessary for it to prove the cause of the origin of the fire, as would otherwise be required under the ruling in the **Lehman-Stern case, 115 La. 1,** and it is sufficient to discharge defendant's liability as a warehouseman, if the proof discloses an absence of negligence on its part not only with reference to the cause of the fire, but also with reference to the efforts that were made to check its spread.

The goods were stored in a warehouse provided for that purpose. There is no proof in the record to show the character of the material of which this warehouse was constructed, and defendant's contention that it was a wooden structure is not supported by the evidence. Even if it were true, however, that fact in itself would not show negligence in the absence of a law prohibiting the use of wooden warehouses. This warehouse was provided with ample protection against the emergency of fire in the shape of water hydrants, hose and nozzles, water-barrels and buckets and fire alarms—all shown to have been tested and found in good condition on the night previous to the fire. A force of trained firemen was stationed in the building, and watchmen patroled the premises as a protection against incendiarism or theft, and in order that, if a fire occurred, its existence might be discovered at once. In the present instance the fire originated in a freight-car which was used to accumulate the sweepings and trash from the warehouses. It was

customary to use the car for this purpose and as soon as it was filled with trash to remove it from the yards. In the present instance the trash car was only partly filled and was left near the warehouse in order that it might be conveniently used in accumulating sweepings. The fire in this car was promptly discovered by watchmen and the apparatus provided by the company for extinguishing fires was promptly brought into play by the company's fire brigade. It was at once discovered, however, that the water supply was wholly insufficient to fight the flames, and, consequently, within four or five minutes after the fire was discovered, one or more automatic alarms were sounded summoning the city's fire department. Meanwhile, however, the flames had been communicated from the car to the warehouse in which plaintiff's goods were stored, and this warehouse was either partially or wholly destroyed before the fire could be extinguished. The evidence discloses that switching engines were promptly employed to move, as far as practicable, all cars from the radius of danger, and that all reasonable effort was made to save from the warehouse property that was stored therein.

Against the presumption in which plaintiff indulges, to the effect that the fire was caused by a spark from a passing engine, it is shown by defendant that no engine had passed within a square of the point of origin of the fire for a long time previous to its discovery, and moreover that all its engines were provided with spark-arresting devices of the latest pattern, and had been found to be in proper condition shortly previous to the fire.

Under the circumstances the Court is of the opinion that the defendant took proper precautions against the occurrence of fires; provided amply for the prompt discovery, as well as for the quenching and checking of fires that might occur.

The fact that the water supply which was furnished it

by the New Orleans Waterworks Company was insufficient at the moment of the fire, exhibits no negligence on defendant's part, particularly in view of the fact that this water supply was tested and found to be ample on the night previous to the fire. Upon the whole the Court is of the opinion that the facts disclose an absence of negligence on defendant's part sufficient to free it from liability as a warehouseman.

The case of **Marande vs. Texas & Pacific Railway, 184 U. S. 173,** cited by plaintiff involved the responsibility of a railroad in its capacity as carrier and not as warehouseman, and moreover discloses a state of facts with reference to the degree of care exercised by the railroad in the care of the goods that easily distinguishes it from the present case.

The judgment of the lower Court, which was in favor of the defendant, is accordingly affirmed.

Judgment affirmed.

January 24, 1910.

### Dissenting Opinion.

ST. PAUL, J.—Plaintiffs are merchants and manufacturers doing business in the City of New Orleans, and defendant is a common carrier operating a line of railroad running out of said city and reaching Cairo, Ill.

On Saturday, December 22, 1906, at about 5:30 or 6 o'clock in the evening, plaintiffs delivered at defendant's freight depot, in said City of New Orleans, a drayload of merchandise consisting of 34 bundles of burlap bags, forming part of a carload lot of 200 and odd bundles to be transported to said City of Cairo, Ill., and there delivered to the H. L. Halliday Mill Co.

The fact that said 34 bundles were to form part of a carload lot, as well as the destination and consignee

were known to defendant's agent, and in accordance with the usual custom in such cases he received the goods and issued a memorandum receipt, which, in due course, was to be surrendered when the full carload lot would be completed and a formal dray ticket issued for the whole.

On the evening of Sunday, December 23, 1906, defendant's freight depot, filled with an assortment of merchandise of every description was totally destroyed by fire and plaintiff's goods were consumed with the rest.

The origin of the fire is not shown, and the issue involved herein is whether defendant held the goods so destroyed as carrier or merely as warehouseman.

The case, therefore, presents the question squarely whether or not, when the shipper tenders, and the carrier accepts, a drayload of goods as part of a carload lot, a contract of affreightment is thereby immediately entered into between them and the liability of a carrier then and there attaches, and not merely that of a warehouseman.

And it seems to me that to state the question is to answer it.

If the liability thereby incurred be only that of warehouseman (either gratuitous or for hire) then it follows that the shipper, who intends to contract with a carrier and not with a warehouseman, and the carrier who, in this State at least, cannot lawfully be a warehouseman, and certainly has no intention of acting as such, find themselves parties, not to a contract of affreightment, which both had in mind, but to a contract for storage, which was not contemplated by either party, but made for them by law.

And in that case, if the shipper be unwilling to have such a contract made for him by law, and risk his goods in the flimsy structure which usually answers for a freight depot with only a warehouseman's responsibility

for his protection, he must then deliver the whole shipment, a whole carload, for instance, at one time. And this very strange consequence then follows: That the law, which, when it comes to the removal of goods by a consignee, recognizes that the impracticable means the impossible, yet grows suddenly unappreciative when the shipper seeks to invoke the same rule in the matter of deliveries to be made by him.

Now, I fully appreciate the fairness and equity of a rule which, in view of the high degree of responsibility to which he is liable, will not subject the carrier to such responsibility for any greater length of time than that which may be necessary to enable the consignee to take his goods away, and obliges the latter to remove them within a reasonable time; a rule which can be justified by many articles of our Code. And "reasonable time" has reference not only to actual time elapsed, but makes allowance as well for the nature and quantity of the goods to be removed, otherwise the term "reasonable time," would be a misnomer and should be changed to "fixed" so that the rule would read "within a fixed time."

And I can readily perceive that the same rule, on the same principle, ought to apply to the shipper. He should not be permitted to subject the carrier to a greater responsibility than that which the latter may reasonably be presumed to have accepted by delaying beyond the time usual and necessary to deliver the whole shipment which the carrier has agreed to forward at one time.

Hence, where the shipper, for his own convenience, uses the carrier's depot as a place in which to collect his goods or deposit merchandise which the carrier is to forward only when and as directed, it would be unreasonable to hold the carrier liable as a carrier, since, as yet, no contract for carriage has been entered into between the parties.

But it is quite different when the merchandise is tendered as part of a shipment to go forward as soon as the balance is delivered, and the carrier receives it agreeing to carry it as a single shipment, as much to his own advantage as to that of the shipper. Here there is a contract of affreightment and there is and can be no other liability than that of a carrier.

Our Code (Civil Code, Art. 2752) qualifies in no manner the liability of a carrier, for goods delivered at his place of deposit to be carried by him. Nothing is said about that liability beginning only when the whole shipment is completed.

No such rule is recognized by the Code Napoleon from which our article is derived. The Commercial Codes of France, Germany, Italy and Spain, of Mexico, Argentina and Chile, draw no such distinction. None ever appeared to the Courts and law writers of France; the Courts of Great Brittain and the great English authors who wrote on principles, have failed to note or mention any such distinction; and the only reason I can conceive why all these law-givers, expounders, and commentators have failed to observe a distinction so important, is because no such distinction exists.

The Supreme Court of this State has applied the text of our Code without regard to any such distinction. Passing by **Barrett vs. Salter et al. (10 Rob. 434)** which may not be in point because there was evidence of negligence, we still have **Roth vs. Harkson et al. (18 An. 705)**, where there was no evidence of negligence, and the defendants were sued exclusively on their liability as common carriers. In that case the vessel was to receive and carry 64 bales of cotton all of which were delivered on a Saturday, except a few bales which were delivered only on the following Monday. Out of a lot of 22 bales delivered late Saturday evening (too late to be put on

— 163 —

board), one bale was found missing on the Monday. But it was held that the defendants were liable as common carriers; even though it clearly appeared that the whole shipment was still incomplete when the loss occurred, and notwithstanding that the rule as to when the carrier's liability began was "elementary," as stated in **Barron vs. Eldridge (100 Mass. 455)**, decided about the same time.

It is true that in that case the defendant were ultimately discharged because the suit was brought by the drayman who had paid for the lost bale, and it was held that he was not thereby subrogated to the rights of his employers; but the point was made, argued, submitted and passed upon, whether there was a complete delivery to the defendants as common carriers.

And it seems to be that a conclusion reached unanimously by the Supreme Court of this State, even if to be considered as a **judicial** dictum, is a safer guide in this jurisdiction than an **obiter** dictum by a divided court of some other State.

For such is the authority relied on by defendant herein, **Watts vs. Boston, Etc. R. R. Co. (106 Mass. 466)**. The case came up on a bill of exception to the charge of the trial Judge. Defendants contended that the goods were being held for plaintiff's convenience; plaintiff contended that defendant had been **directed to ship;** and the trial Judge charged that the defendant was liable even if given only **authority** to ship. As said by the Court, that was a stronger position against defendant than even plaintiff contended for, and a majority of the Court held that mere authority to ship was not sufficient, since defendant "had not been instructed to ship, and *had not agreed to do so.*" (Italics mine.) In other words, there was no contract to carry the goods, and, hence, could be no liability as carrier. And then proceeding "argu-

endo'' the Court did say something about "Articles transported by carload lots which are delivered at the depot on different days and in small quantities to be kept there till one or more carload lots are collected." And of "the duty of transportation" not arising on the delivery of a single dray load simply because authority might have been given to ship the goods in small quantities. But no question was before the Court of a contract by the carrier with the shipper to furnish transportation for a carload lot; and the Court seemed to have had in mind the convenience and economy to the carrier in the mode of shipment; so that the illustration actually conflicts with the rule that if the shipment is delayed for the convenience of the carrier himself he is, of course, responsible. This I mention only to show the question could not even have been argued; had it been, the Court would have better understood the meaning of shipping by carload lots, such as we have in this case. The passage is purely obiter and should not be accepted as authority.

The other authorities relied on by defendant herein merely state a general rule, but make no such application of that rule as, in my opinion, conflicts with the views herein expressed; except perhaps the case from Kansas, Mo. Pac R. R. Co. vs. Riggs (62 Pac. Rep. 712), a case which, to me, is uninteligible, for the goods were struck by lightning, and the case seems to have been remanded for evidence as to the condition of defendant's lightning arresters. This was thrusting defendant from the pan into the fire, and it is to be presumed that the Court was not given an opportunity to reconsider its ruling through any application for a rehearing on the part of the plaintiff. At any rate this authority is not binding on me, and the reasoning does not appeal to me.

I am, therefore, constrained to dissent from the opinion and decree of the majority of the Court herein.

I may add, however, that could I take the view that defendant held the bags destroyed by fire, as warehouseman and not as carrier, I would concur in the decree, for I see no evidence of negligence on the part of the defendant.

January 24, 1910.

Rehearing refused February 9, 1910.

Writ refused by Supreme Court March 16, 1910.