# TEXAS AND PACIFIC RAILWAY COMPANY *v.* CLAYTON.

**ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.**

No. 222. Argued January 27, 1899. — Decided February 20, 1899.

The Texas and Pacific Railway Company received at Bonham, in Texas, 467 bales of cotton for transportation to Liverpool. It was to be taken by the company over its road to New Orleans, and thence to Liverpool by a steamship company, to which it was to be delivered by the railway company at its wharf in New Orleans. Each bill of lading contained the following, among other clauses: " The terms and conditions hereof are understood and accepted by the owner, viz.: (1) That the liability of the Texas and Pacific Railway Company, in respect to said cotton, and under this contract, is limited to its own line of railway, and will cease, and its part of this contract be fully performed upon delivery of said cotton to its next connecting carrier; and in case of any loss, detriment or damage done to or sustained by said cotton before its arrival and delivery at its final destination, whereby any legal liability is incurred by any carrier, that carrier alone shall be held liable therefor in whose actual custody the cotton shall be at the time of such damage, detriment or loss." The cotton reached New Orleans in safety, and was unloaded at the wharf, and the steamship company was notified; but before it was taken possession of by that company it was destroyed by fire at the wharf. The owners in Liverpool having brought suit against the railway company to recover the value of the cotton, that company, on the facts detailed at length in the opinion of the court, contended that the cotton had passed out of its possession into that of the steamship company; or, if the court should hold otherwise, that its liability as common carrier had ceased, and that it was only liable as a warehouseman. *Held*, that the goods were still in the possession of the railway company at the time of their destruction; and that that company was liable to their owners for the full value as a common carrier, and not as a warehouseman.

THE case is stated in the opinion.

*Mr. Rush Taggart* and *Mr. Arthur H. Masten* for plaintiff in error.

*Mr. Treadwell Cleveland* for defendants in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was brought by the defendants in error, subjects of the Queen of Great Britain and Ireland, against the Texas and Pacific Railway Company, a corporation existing under an act of Congress approved March 3, 1871, c. 122, 16 Stat. 573, and engaged in the business of a common carrier of merchandise for hire. Its object was to recover the value of four hundred and sixty-seven bales of cotton destroyed by fire.

The complaint alleged that in the month of October, 1894, at Bonham, Texas, the plaintiffs delivered to the defendant railway company 500 bales of cotton, which it agreed to carry safely and securely at a through price or rate from the place of shipment to Liverpool, England, by way of New Orleans and there deliver the same on the payment of the freight; that the defendant failed to keep its agreement and to carry safely 467 of the bales of cotton to Liverpool, and there to deliver the same, although the plaintiffs had duly demanded delivery thereof and had been at all times ready and willing to pay the freight for the carriage; that through its negligence and carelessness and without the fault of the plaintiffs those 467 bales, worth $17,314.43, were on or about November 12, 1894, wholly destroyed by fire at Westwego, Louisiana, "at which time and place the same were in the possession of the defendant in the course of such carriage and as a common carrier;" and that the defendant has refused upon plaintiffs' demand to pay the value of the cotton so destroyed.

The defendant admitted the destruction of the cotton by fire at the time and place named, but made such denial of the material allegations of the complaint as put the plaintiffs on proof of their case.

The plaintiffs having read in evidence the bills of lading, and made proof of the value of the cotton as shown by certain stipulations between the parties, rested their case. Thereupon the defendant moved the court to direct the jury to render a verdict in its behalf. That motion was denied with exceptions to the defendant. At the close of all the evidence the jury by direction of the court returned a verdict in favor

of the plaintiffs for the sum of $14,068, and judgment for that sum with costs was entered against the defendant company. Upon writ of error to the Circuit Court of Appeals that judgment was affirmed. 51 U. S. App. 676.

The action was based upon four bills of lading issued by the railway company. Two of them were dated October 10th, and the others October 15th and October 23d respectively. They are alike in form, and identical in respect of the terms and conditions of the contract. Each one showed a receipt by the railway company of a given number of bales, "in apparent good order and well conditioned, of Castner & Co., for delivery to shippers' order or their assigns, at Liverpool, England, he or they paying freight and charges as per margin;" also, that the cotton received was to be carried "from Bonham, Texas, to Liverpool, England, route, via New Orleans and Elder, Dempster & Co. steamship line."

Each bill of lading contained also the following clauses:

"The terms and conditions hereof are understood and accepted by the owner.

"Upon the following terms and conditions, which are fully assented to and accepted by the owner, viz.:

"1. That the liability of the Texas and Pacific Railway Company, in respect to said cotton, and under this contract, is limited to its own line of railway, and will cease, and its part of this contract be fully performed upon delivery of said cotton to its next connecting carrier; *and* in case of any loss, detriment or damage done to or sustained by said cotton before its arrival and delivery *at its final destination*, whereby any legal liability is incurred by *any* carrier, that carrier *alone* shall be held liable therefor in whose *actual custody* the cotton shall be at the time of such damage, detriment or loss.

"2. That the rate of freight for transportation of said cotton, specified in the margin hereof, is quoted and guaranteed with the distinct understanding and only on condition that the weight of said cotton is truly and correctly represented and stated; that said rate only includes the charge for transportation, and the specification of said rate shall not be taken as any guide for construction or evidence to extend this

contract in other respects, or to bind the Texas and Pacific Railway Company to transport or to become in anywise responsible for said cotton after delivery thereof to its next connecting carrier, but shall only bind said company to protect said rate. . . ."

"5. It is further agreed that in case said cotton is found at point of delivery to have been injured by any of the excepted clauses specified in this bill of lading, the burden of proof shall be upon the owner of said cotton or claimant to establish that such injury resulted from the fault of the carrier.

"6. That the said cotton shall be transported from the port of New Orleans to the port of Liverpool, England, by the Elder, Dempster & Co. steamship line, with liberty to ship by any other steamship or steamship line; and upon delivery of said cotton to said ocean carrier at the aforesaid port this contract is accomplished, and thereupon and thereafter the said cotton shall be subject to all the terms and conditions expressed in the bills of lading and master's receipt in use by the steamship or steamship company or connecting lines by which said cotton may be transported; and upon delivery of said cotton, at the usual place of delivery of the steamship or steamship lines carrying the same, at the port of destination the responsibility of the carriers shall cease."

The facts out of which the case arises are these: The railway company had warehouses and yards in New Orleans where its road terminated. Westwego is a branch station or terminal opposite that city. The company had a wharf with tracks and an office and sheds on it — the wharf having been constructed over the Mississippi River so that cars could be run upon the railroad tracks in its rear and unloaded, and so that vessels could come to its front to receive freight placed on it. The cotton in question was unloaded at the wharf at various dates from October 22, to November 4, 1894, and was burned while on the wharf in the evening of November 12, 1894.

On each of the bills of lading are the following words: "T. & P. contract No. 44." It does not appear that the shippers were informed what were the terms of that contract.

It was in proof, however, that it was in substance a contract with the Elder, Dempster & Co. steamship line to connect with the Texas and Pacific Railway Company and receive from the latter 20,000 bales of cotton during the months of October, November and December, 1894, on the conditions specified on the reverse side of the contract. Those conditions do not affect the questions here presented, but it was proved that the railway and the steamship companies agreed that the place of delivery of the cotton under the contract between them should be the wharf at Westwego.

The mode in which the railway company and the steamship company transacted business was as follows: Upon the shipment of cotton, bills of lading would be issued in Texas to the shipper. Thereupon the cotton would be loaded in the cars of the railway company and a way bill indicating the number and initial of the car, the number of the bill of lading, the date of shipment, the number of bales of cotton, the consignor, the consignee, the date of the bill of lading, the number of bales forwarded on that particular way bill, the marks of the cotton, the weight, rate, freights, amount prepaid, etc., would be given to the conductor of the train bringing the car to Westwego. Upon the receipt of the way bill and car at Westwego, a "skeleton" would be made out by the clerks at that place for the purpose of unloading the car properly. It contained the essential items of information covered by the way bill, and had also the date of the making of the skeleton. When this skeleton had thus been made out and the car had been pushed in on the side track in the rear of the wharf, it would be taken by a clerk known as a "check clerk," and with a gang of laborers, who actually handled the cotton and were employed by the railway company, the car would be opened; and as the cotton was taken from the car bale by bale the marks would be examined to see that they corresponded with the items on the skeleton, and the same were then checked. The cotton thus taken from the car was deposited at a place on the wharf designated by the check clerk, and it would remain there until the steamship company came and took it away. After the checking of the cotton in this

way to ascertain that the amounts, marks and general information of the way bill were correct, the skeleton would be transmitted to the general office of the Texas and Pacific Railway Company in New Orleans, which thereupon would make out what was designated as a "transfer sheet" that contained substantially the information contained in the way bill, and which being at once transmitted to the steamship company or its agents was a notification understood by the steamship company's agents that cotton for their line was on the wharf at Westwego ready for them to come and take away. Upon the receipt of these transfer sheets the steamship company would collate the transfers relating to such cotton as was destined by them for a particular vessel, advise the railway company with the return of the transfers that this cotton would be taken by the vessel named, and would thereupon send the vessel with their stevedores to the wharf at Westwego. The clerk at Westwego would go around the wharf and by the aid of the transfers returned from the steamship agents point out to the master or mate of the vessel, or the one in charge of the loading, the particular lots of cotton named in the transfers and designated for his vessel, and the stevedores and their helpers would thereupon take the cotton and put it on board the ship. In connection with the loading upon the vessel or after the cotton was pointed out in lots, the master or mate would sign a mate's receipt for this cotton. The stevedores and all men employed in loading the vessel were wholly in the employ of the steamship company. The time of coming to take cotton from the wharf was entirely in the control of the steamship company. They sent for it as soon as they were ready.

This was conceded to have been substantially the method of business between the railway company and the steamship company.

Counsel for the railway company correctly states that on the morning of the fire, and on other occasions prior thereto both in October and November, the officers of the railway company gave verbal notice to the steamship company that the cotton was upon the wharf ready for the steamship com-

pany to take away and made request that the same should be removed; that the attention of the officers of the steamship company was called to the amount of cotton on the wharf which they had contracted to carry, and they were requested to move it at the earliest possible moment and to comply with their contract; and that in reply they said, in substance, that their ships had been delayed, the principal cause being certain labor troubles then existing in New Orleans with employés of the steamship companies, and another cause being the bad weather.

It may be taken as established by the evidence that the cotton in question was for some days before the fire in a position on the wharf ready to be taken by the steamship company.

So far as the management of the wharf and the protection of the cotton against fire were concerned, the evidence failed to show any negligence on the part of the railway company.

The defendant moved for a verdict in its behalf upon two grounds : 1. The evidence showed a delivery of the cotton to the connecting carrier before the fire occurred. 2. If no delivery took place before the fire, there had been a sufficient tender of the cotton to the steamship carrier, and thereafter, in view of the facts, the railway company should be deemed to have held it as a warehouseman, and as there was no proof of negligence it was not liable for the value of the cotton.

The principal question arises out of that clause in the bill of lading providing that in case of any loss, detriment or damage done to or sustained by the cotton before its arrival and delivery at its final destination, whereby liability was incurred by any carrier, that carrier *alone* should be held liable therefor in whose *actual* custody the cotton should be at the time of such damage, detriment or loss. The Circuit Court of Appeals and the Circuit Court concurred in the view that the cotton when burned was, within the meaning of the contract, in the actual custody of the railway company. It will not be disputed that in determining this question regard must be had to all the provisions of the contract. The clause declaring that the railway company should be deemed to have fully performed its part of the contract " upon delivery of said cotton

to its next connecting carrier" must be taken with the clause immediately following which makes that carrier alone liable who had actual custody of it at the time of the loss. The first thought suggested by these clauses, taken together, is that the parties recognized the possibility that it might be often difficult to determine what, as between carriers, in view of their relations to each other, would constitute a sufficient delivery to the connecting carrier. And in order to meet that difficulty the clause relating to actual custody was added, so as to indicate that the delivery intended, so far as liability to the shipper for loss was concerned, was not a constructive one, but such a delivery as involved actual custody of the cotton by the connecting carrier. We do not understand that counsel for the railway company dispute this general view. But they insist that within the meaning of the contract, and under the facts disclosed by the evidence, the steamship company had actual custody of the cotton at the time it was burned. In support of their contention they rely principally upon *Pratt* v. *Railway Company*, 95 U. S. 43, 46, and the cases upon which that case largely rests — *Merriam* v. *Hartford & New Haven Railroad Co.*, 20 Conn. 354, and *Converse* v. *Norwich & New York Transportation Co.*, 33 Conn. 166.

It is important to understand what were the facts upon which the judgment in *Pratt* v. *Railway Company* was based. According to the report of that case they were these:

The Grand Trunk Railway Company, engaged as a carrier in the transportation of property, had received at Montreal to be carried to Detroit certain goods shipped at Liverpool for St. Louis. The goods reached Detroit in the cars of that company on the 17th day of October, 1865, and were destroyed by fire in the night of the succeeding day.

The company had no freight room or depot at Detroit, but it used there a single section or apartment in the freight depot of the Michigan Central Railroad Company, a building several hundred feet long, three or four hundred feet wide, and all under one roof. Its different sections were without partition walls between them. In the centre of the building there was a railroad track for cars to be loaded with freight. The sec-

tion in that building used by the Grand Trunk Company was used only as a place for depositing goods and property that came over its road or that were delivered for shipment over it. In common with the rest of the building, that section was under the control and supervision of the Michigan Central Company.

The Grand Trunk Company employed in its section two men, who checked freight coming into it. But all freight that came into that section was handled exclusively by the employés of the Michigan Central Company, and the Grand Trunk Company paid that company a fixed compensation per hundredweight for such work as well as for the use of its section.

Goods coming into that section from the Grand Trunk Railroad to be carried over the road of the Michigan Central Company, after being unloaded were deposited by the employés of the latter company in a certain place in the Grand Trunk section, from which they were loaded into the cars of the Michigan Central Company by its own employés, whenever that company was ready to receive them; and after being so placed the employés of the Grand Trunk Company did not further handle such goods.

Whenever the agent of the Michigan Central Company saw any goods deposited in the section of the freight building used by the Grand Trunk Company and which were to be carried over the line of the former company, he would call on the agent of the latter company in the building, and from the way bill exhibited by the agent of the Grand Trunk Company take a list of such goods, and would then for the first time learn their place of destination, together with the amount of freight charges due thereon. From the information thus obtained a way bill would be made out by the Michigan Central Company for transportation of the goods over its line of railway, and not before.

The goods referred to in the *Pratt case* were taken from the Grand Trunk cars on the 17th day of October, 1865, and deposited in the apartment of the freight building used by the Grand Trunk Company in the place assigned for goods so destined.

At the time the goods were forwarded from Montreal the way bill in accordance with usage in such cases was made out in duplicate, on which were entered a list of the goods, the names of the consignees, the places to which they were consigned, and the charges against them from Liverpool to Detroit. The conductor having charge of the train containing the goods would take one of these way bills, and on arriving at Detroit would deliver it to the checking clerk of the Grand Trunk Company, "from which said clerk checked said goods from the cars into said section." The other copy would be forwarded to the agent of the Grand Trunk Company at Detroit. "It was the practice of the Michigan Central Railroad Company, before forwarding such goods, to take from said way bill in the custody of said checking clerk, in the manner aforesaid, the place of destination and a list of said goods, and the amount of accumulated charges, and to collect the same, together with its own charges, of the connecting carrier."

This court, in view of these facts, said: "We are all of the opinion that these acts constituted a complete delivery of the goods to the Michigan Central Company, by which the liability of the Grand Trunk Company was terminated. 1. They were placed within the control of the agents of the Michigan Company. 2. They were deposited by one party and received by the other for transportation, the deposit being accessory merely to such transportation. 3. No further orders or directions from the Grand Trunk Company were expected by the receiving party. Except for the occurrence of the fire, the goods would have been loaded into the cars of the Michigan Central Company, and forwarded, without further action of the Grand Trunk Company. 4. Under the arrangement between the parties, the presence of the goods in the precise locality agreed upon, and the marks upon them, 'P. & F., St. Louis,' were sufficient notice that they were there for transportation over the Michigan road towards the city of St. Louis; and such was the understanding of both parties." Referring to the section of the freight building specially used by the Grand Trunk Company, the court said : "It was a por-

tion of the freight house of the Michigan Company, in which a precise spot was selected or set apart, where the defendant might deposit goods brought on its road and intended for transportation over the Michigan road, and which, by usage and practice and the expectation of the parties, were then under the control of the Michigan Company, and to be loaded on its cars at its convenience, without further orders from the defendant."

We do not think that the judgment in *Pratt* v. *Railway Company* controls the determination of the present case. In many important particulars the two cases are materially different. In the *Pratt case* the court proceeded upon the ground that the goods were deposited in a section of a freight building set apart by the connecting carrier, the owner of the building, for goods coming over the line of the first carrier to be transported in the cars of the connecting carrier to the place to which they were consigned, the goods having been unloaded by the employés of the connecting carrier and by them deposited in that section, to be put by such employés into the cars of that carrier at its convenience. It was a case in which the goods passed under the complete control and supervision and into the actual custody of the connecting carrier from the moment they were deposited in the section set apart for them.

In the case at bar, the facts plainly indicate that although the goods had been placed by the first carrier upon the wharf, and although that was the place at which the steamship company was to receive or usually received goods from the railway company for further transportation, they were not in the actual possession or under the actual control of the connecting carrier at the time of the fire. The connecting carrier had not given a mate's receipt for the cotton or assumed control of it. True, it had received notice that the goods were on the wharf and could be taken into possession, but such notice did not put the cotton into the actual custody of the connecting carrier. The opportunity given it to take possession or its mere readiness to take possession was not under the contract equivalent to placing the cotton in the actual

custody of the steamship line. The undertaking of the railway company was to transport safely and deliver to the next connecting carrier. But its further express agreement was, in substance, that if any carrier incurred liability to the shipper in respect of the goods, that carrier alone was to be liable who, at the time the cotton was damaged or lost, had it in actual custody. In other words, the delivery to the connecting carrier which would, as between the first carrier and the shipper, terminate the liability of such carrier, must have been a delivery that put the cotton into the actual, not constructive, custody of the connecting carrier. To hold otherwise is to eliminate from the contract the clause relating to actual custody. The entire argument of the learned counsel for the railway company in effect assumes that the contract means no more than it would mean if that clause were omitted. But the court cannot hold that that clause is meaningless, or that it was inserted in the contract in ignorance of the meaning of the words " actual custody." Nor can it be supposed that the parties understood the contract to mean that the connecting carrier was to be deemed to have actual custody from the moment it could have taken actual custody if it had seen proper to do so. So far as the shipper was concerned, the actual custody of the first carrier could not cease until it was in fact displaced by the actual custody of the connecting carrier. It may be that the railway company has good ground for saying that, as between it and the connecting carrier, the latter was bound to take actual custody whenever the railway company was ready to surrender possession, and thereby relieve the latter from possible liability to the shipper in the event of the loss of the cotton while in its custody. That is a matter between the two carriers, touching which we express no opinion. But we adjudge that the shipper cannot be compelled, when seeking damages for the value of his cotton destroyed by fire in the course of its transportation, to look to any carrier except the one who had actual custody of it at the time of the fire. One of the conditions imposed upon him by the contract was that if any carrier became liable to him he should have no remedy except against the one having such

actual custody. That remedy should not be taken from him by a construction of the contract inconsistent with the ordinary meaning of the words used.

The two cases in the Supreme Court of Connecticut which were cited in *Pratt* v. *Railway Co.*, undoubtedly sustain the principles announced in that case, but they do not militate against the views we have expressed in this case.

*Merriam* v. *Hartford & New Haven Railroad Co.*, 20 Conn. 354, 360, was an action on the case for negligence on the part of a railroad company in the transportation and delivery of certain goods, and in which it was a question whether the goods had been delivered to the company before their destruction. After stating the general rule to be that, in order to charge a common carrier for the loss of property delivered to it for transportation, the property must be delivered into the hands of the carrier itself or its servant or some person authorized by the carrier to receive it, and that if it was merely deposited in the yard of an inn, or upon a wharf to which the carrier resorts, or in the carrier's cart, vessel or carriage, without the knowledge and acceptance of the carrier, its servants or agents, there would be no sufficient delivery to charge the carrier, the court said: "But this rule is subject to any conventional arrangement between the parties in regard to the mode of delivery, and prevails only where there is no such arrangement. It is competent for them to make such stipulations on the subject as they see fit; and when made, they, and not the general law, are to govern. If therefore they agree that the property may be deposited for transportation at any particular place, without any express notice to the carrier, such deposit merely would be a sufficient delivery. So if, in this case the defendants had not agreed to dispense with the express notice of the delivery of the property on their dock, actual notice thereof to them would have been necessary; but if there was such an agreement, the deposit of it there, merely, would amount to constructive notice to the defendants, and constitute an acceptance of it by them. And we have no doubt, that the proof by the plaintiff of a constant and habitual practice and usage of the

defendants to receive property at their dock for transportation, in the manner in which it was deposited by the plaintiff, and without any special notice of such deposit, was competent, and in this case, sufficient to show a public offer, by the defendants, to receive property for that purpose and in that mode; and that the delivery of it there accordingly by the plaintiff in pursuance of such offer should be deemed a compliance with it on his part, and so to constitute an agreement between the parties by the terms of which the property, if so deposited, should be considered as delivered to the defendants without any other notice. Such practice and usage were tantamount to an open declaration, a public advertisement, by the defendants, that such a delivery should of itself be deemed an acceptance of it by them for the purpose of transportation; and to permit them to set up against those who had been thereby induced to omit it, the formality of an express notice, which had thus been waived, would be sanctioning the greatest injustice and the most palpable fraud."

*Converse* v. *Norwich and New York Transportation Co.*, 33 Conn. 166, 181, involved the question whether certain goods had been delivered to the connecting carrier prior to their destruction by fire. The wharf and depot building in which the goods were deposited by the first carrier were owned by the connecting carrier, and the first carrier paid an annual rental for its use in its business. The court, among other things, said: "We have no difficulty in determining, indeed we must hold, that there was a mutual agreement, or tacit understanding equivalent to such an agreement, that the transportation company should place the through freight at that precise spot, and that the Northern road should take it from thence at a time convenient to them. The construction of the depot and the uniform usage are conclusive of it. The depot was constructed with a platform by the side of the track for the reception of goods to be taken from or put into the cars; and on that platform the railroad company in the first and every instance of delivery by them placed their freight, and the transportation company at their convenience took it away and carried it on board their boat. And so the trans

portation company in like manner, in the first and every instance, placed there the freight for the Northern road; and they at their convenience put it in their cars and took it away. And the usage was precisely the same with the Worcester road. . . . Upon this wharf and into the enclosure the Northern road laid their track for the delivery and reception of freight to and from the transportation company. Both parties then contemplated a delivery and reception on this wharf and in this enclosure, and obviously in the precise manner actually pursued. . . . It is clear then that both the transportation company and the Northern road contemplated that a placing of freight by either intended for the other upon that platform was all that either was to do by way of delivery of their freight to each other."

It is to be observed that neither in the *Pratt case* nor in the *Converse* and *Merriam cases* was there any clause in the contract between the parties to the effect that the shipper, in enforcing his claim for liability, should look alone to the carrier who had the actual custody of the goods at the time they were lost or destroyed. It is the clause of that character in the bill of lading now in suit which makes the judgments in the *Pratt, Converse* and *Merriam cases* inapplicable to the present case.

A further contention of the defendant is that at the time of the fire it held the goods, if at all, only as a warehouseman and not as a common carrier, and that the Circuit Court erred in not so instructing the jury. We cannot assent to this view. As the goods had not at the time of the fire passed into the actual custody of the steamship company, and as the contract expressly declared that if any carrier was liable for their destruction that one alone should be liable in whose actual custody the goods were when destroyed, the defendant could not escape responsibility by showing that the connecting carrier could by reasonable diligence have taken actual custody prior to the fire. In other words, it could not convert itself into a warehouseman by proving that it had, before the fire, tendered the goods to the connecting carrier, and that the latter neglected, although without reasonable excuse, to take them

into its actual custody. Even if this were not so, the suggestion that the railway company had become a warehouseman before the fire occurred can be disposed of on the grounds stated by the Circuit Court of Appeals. Speaking by Judge Wallace, that court said: "There is no room for the contention that the defendant had ceased to be a carrier and became a warehouseman. It had done no act evidencing its intention to renounce the one capacity and assume the other. Although it had requested the steamship line to remove the cotton, it had not specified any particular time within which compliance was insisted on, and had not given notice that the cotton would be kept or stored at the risk of the steamship line upon failure to comply with the request. The request to come and remove it ' as soon as practicable ' was, in effect, one to remove it at the earliest convenience of the steamship line. There is nothing in the case to indicate that the defendant had not acquiesced in the delay which intervened between the request and the fire." 51 U. S. App. 676, 686.

Under the views expressed in this opinion, it is unnecessary to enter upon a review of the numerous cases cited by counsel for the railway company in their able and elaborate brief to support the different propositions discussed by them.

We are of opinion that the Circuit Court did not err in directing a verdict for the plaintiff, and the judgment is

*Affirmed.*