## ST. LOUIS, B. & M. RY. CO. v. UNITED STATES FIRE INS. CO. OF NEW YORK.

### No. 1428—6060.

Commission of Appeals of Texas, Section B.
May 26, 1933.

Andrews, Streetman, Logue & Mobley and Robert H. Kelley, all of Houston, for plaintiff in error.

V. A. Collins, of Dallas, and S. H. German and Baker, Botts, Andrews & Wharton, all of Houston, for defendant in error.

LEDDY, Judge.

Plaintiff in error, the St. Louis, Brownsville & Mexico Railway Company, sued defendant in error, the United States Fire Insurance Company of New York, to recover indemnity for the loss of certain cotton in the destruction by fire of the compress of the Aransas Compress & Warehouse Company at Harlingen. At the time the cotton was destroyed it was covered by bills of lading theretofore issued by plaintiff in error.

There were two classes of this cotton, one designated as "city cotton," which originated at Harlingen, and which at the time of the fire was located upon the platform of said compress company. The other lot destroyed is designated as "transit cotton." It had originated at other points on plaintiff in error's line of railroad, and had been stopped at Harlingen for compression in transit.

The case was tried without the intervention of a jury, and the trial court rendered judgment in favor of plaintiff in error for $52,779.21 on the city cotton, and $29,996.84 on the transit cotton, with 6 per cent. interest on said amounts, and for all costs.

Defendant in error perfected its appeal to the Court of Civil Appeals for the First District, and the majority of that court affirmed the judgment awarding a recovery for the city cotton, but reversed the judgment with respect to the transit cotton, and rendered judgment thereon in favor of defendant in error. 41 S.W.(2d) 118. Judge Graves dissented to the latter portion of the judgment rendered by the majority. His opinion sustained the judgment of the trial court in its entirety.

The only defense presented by defendant in error with respect to the recovery for the loss of the transit cotton was that by the terms of the policy sued upon cotton was not covered which was under the protection of any other policy of insurance which would have applied if the policy sued on had not been issued, and it was asserted that the transit cotton was in fact insured by the terms of a policy issued by the Camden Insurance Company. The defense thus urged was predicated upon the following stipulation in the policy issued by defendant in error. "It is understood and agreed that in respect to cotton under bills of lading at compresses, this policy does not cover the assured's liability for any cotton which is under the protection of any other policy of insurance, marine or fire (issued for the benefit of the assured), which would have applied if this policy had not been issued, and in the event of there being other insurance in force, it is understood that this policy shall not contribute therewith in the payment of any loss."

The basis for the contention that the transit cotton was covered by the Camden policy is the following provision contained in that policy:

"1. For account of the Assured, Aransas Compress Company, this Company agrees to indemnify the hereafter named Transportation Line or Lines for payments on account of legal liability as common carriers or warehousemen for loss or damage by fire to cotton and/or cotton linters in bales under through bills of lading, originating at a place other than the compress of this assured, and consigned to a destination beyond the compress of this assured, and stopped enroute for the purpose of compression and re-shipment, only while in the custody of the assured and while contained in any of the buildings, sheds, platforms and/or yards of the hereinafter described premises of the assured, and in closed cars on side-tracks customarily used and available for loading and unloading at said compress.

"2. The premises of the assured referred to above are as follows: Harlingen, Texas.

"3. This insurance is for account of the following transportation lines: St. Louis, Brownsville & Mexico Railway Company."

The parties to this suit are not in accord as to a proper construction of the above provision of the Camden policy. Plaintiff in error's view, which was denied by the majority opinion of the Court of Civil Appeals and adopted by the minority, is that under the above provision of the Camden policy the transit cotton was not covered unless it was in the actual custody of the compress company at the time it was destroyed by fire.

On the other hand, defendant in error insists: First, that the coverage of the Camden policy included the transit cotton, regardless of whether it were in the actual custody of the compress company, because the express terms of said policy insured cotton "in closed cars on side-tracks customarily used and available for loading and unloading at said compress"; and, second, the undisputed evidence showed that possession of such cotton had passed from the railway company to the compress company prior to the time it was destroyed by fire.

The transit cotton was contained in seven closed cars. These cars were received by the railway company on the night of July 31, 1926, and placed by it on the side tracks which ran along the compress platform. The tracks on which the cars were situated at the time they were destroyed were those where transit cotton was customarily loaded and unloaded on and from the compress platform.

There is no substantial controversy as to the method pursued by the railway company and the compress company in handling shipments of cotton of this nature. The uniform custom of dealing between the railway company and the compress company with respect to delivery of the cotton by the railway company to the compress company for compression is disclosed by the testimony of Mr. Hundley, the agent of the railway company at Harlingen, who testified by deposition as follows:

"When transit cotton is received the first thing we do is to make compress unloading slips in duplicate, giving full reference on that slip, in order that the compress may know it is not for concentration, and it is checked out the same as any other cotton. The unloading slip is made up from the waybills which come in with the train. Those waybills are brought to the office. That is done after the train arrives in the switch yards at Harlingen, and from that waybill we make out the unloading slip. * * * When the slips are made up from the waybills coming with the cars of cotton, which shows the date received at Harlingen, car number, initials, bill of lading number, date, point of origin, waybill number and date, then the point of origin, destination, then the name of the railroad delivering to the press here for account of, then the consignor, and the next line is consignee; then further down in the body of the slip we show marks and number of bales of cotton and whether for concentration or transit. In that particular part of the slip there is one place for showing whether it is for concentration or for transit. In the body of the slip, under those two headings, we list a description of the cotton by markings and number of bales. Further on down on the slip there appears the printed words 'over' and 'short', that is filled in when checking the car. If we should be over a bale we mark it there, and if we are short one bale we mark it over here. There also appears the word 'con-

dition' with a blank after it, but we don't use that much, but I suppose that is to show the condition, whether damaged, country damaged, cow eaten and such as that.

"Further down on the slip appears the printed words 'check as above', below which is a blank, underneath which is printed 'Railroad Agent,' and another blank under which is printed 'Compress Superintendent.' All slips we deliver them are signed at the time they are made out by the railroad agent, by me or my representative, and this cotton is then checked out and then the compress signs. I mean this slip is signed by me or my representative in the blank for the railroad agent; then the cotton is delivered to the compress company and unloaded and checked; and when it is checked notations are put in it over and short, or condition, the latter of which we do not use much, and thereafter the compress superintendent, or his agent, signs in the blank for the compress superintendent. The duplicate of this slip is sent back to us, and the compress retains the original. The slips are made in duplicate, and the duplicate is returned to us, signed by the compress superintendent, and they keep the original. * * *

"In nearly every case our cotton is all received at night, before midnight, sometimes later on, and these slips are then made up by the night clerks after midnight, in time to have them ready for the compress for the following morning, showing full information. We had someone on duty at night at the time of this fire who made out those. That person worked from midnight until eight a. m. * * *

"After a waybill had been brought to this office, and an unloading slip made out in duplicate, and the slip taken by our cotton clerk to the compress, and the car placed at the compress for unloading, that was authority for the compress to go ahead and unload the shipment while they were working. There was supposed to be somebody there for the railroad company at that unloading; we had a man employed for that purpose. There was one man employed by the railroad company at that time for that purpose. The man employed for that purpose was J. S. McCracken. Mr. McCracken would deliver this unloading slip to the compress; they would put it right on the file where they were unloading cars and making up weight sheets, and keep it there to tally with the cotton coming out of the car. If that data did not tally with the cotton coming out of the car we would make a notation, whether over or short. The compress and our cotton clerk together are supposed to make that notation, and we would be notified and trace it up. After that is done one copy of the unloading slip is signed by the superintendent of the compress and sent to our office later during the day, and they keep one copy. * * *

"Q. Is there any rule of the railroad which you follow in pursuing that course of conduct? A. That's our instructions.

"I have never deviated from those instructions in any case.

"The compress company did not give any orders for the setting of cars until they got in position to unload them; we usually watched that ourselves."

Upon the trial this witness testified in person, and gave the following additional testimony: "In my deposition I testified that we gave the compress company an unloading slip when we set a car of cotton in to the compress to be unloaded by the compress, and that that unloading slip was their authority to unload the cotton. We would render those unloading slips in our office in duplicate, and send them to the compress for their record. I don't expect I went far enough in my deposition to explain that. That was full authority to unload the cotton, provided our representative was there at the time of the unloading. Our representative had to take the seals on the car first. * * * That is the last writing the railroad company would deliver to the compress company before they would unload the cotton. The other requirement which the compress company was obliged to comply with before actually unloading the cotton was that it was the duty of our cotton man to be present and check that cotton out. In other words, they had to engage in a joint check by the compress man and the railroad man and check the cotton out. * * * They have a double check on it that way,—our check and the compress check. The list calls for those bales on a weight sheet, which they furnish the shipper later on. Along on the bottom of this unloading slip there is a place for the signatures of the railroad agent and the compress superintendent. That was actually signed after this joint check had taken place. The railroad agent's signature is put on there before the unloading slips are sent to the compress, and when it is unloaded the compress superintendent, or some of his representatives sign it. Our man was supposed to go there and break the seals, or supervise the breaking of the seals and to participate in this joint check."

The testimony of Mr. Loving, superintendent of the compress company, as to the method of handling such cotton, is in substantial accord with that given by Mr. Hundley.

Mr. McCracken, the employee who checked shipments of this nature for the railway company, testified as follows: "At that time my duties consisted of going to the compress platform early in the morning and seeing that the cars were opened and then checked the cotton out. The usual practice there was that when we would break the seals and open the car door and put the board down, and I would stand in the door and check the cot-

ton out, and if there were any shortage or overs I would make notations on those slips. * * * I stood by the car door in order to see that the cotton was being unloaded, and together with the representative of the compress company I checked the cotton out of the car and noted whether there were any overs or shortage, and the condition of the cotton, and if there was any bad condition I noted that on the slip. After the cotton was checked I would phone the information to the depot and later that slip went to the depot. After that joint check of the cotton was made the representative of the compress company would sign that slip, and he was also given a duplicate of the slip. * * * That was the practice that was regularly adhered to by me during all the time I was employed there in that capacity. I invariably checked the cotton that was unloaded from the cars and the cotton loaded into the cars. I was present at the breaking of all seals on the cars that came into the compress to be unloaded. Sometimes I would break the seals myself when we were in a hurry, and again I would have a negro to go along with me and take the cotton hook and break the seals, but it was the invariable custom and · practice for me to be present when the seals were broken; I had to be there at that time, and I adhered to that practice. I made a record of the breaking of those seals; I have that record here with me."

Assuming for the present moment that the Camden policy afforded no protection for cotton not in the actual custody of the compress company, the question arises: Under the uniform custom of handling this cotton, in whose custody was it at the time it was destroyed by fire?

■ It is our conclusion the undisputed evidence shows that there was no delivery of the cotton by the railway company to the compress company prior to the time it was destroyed by fire; hence, possession of said cotton remained with the railway company.

The question as to whether this cotton was in the custody of the compress company at the time it was destroyed must be judged in the light of the uniform usage and custom with respect to handling shipments of this kind. It is true the closed cars containing this cotton were spotted upon tracks adjacent to the compress at points where it was customary to unload such cotton. Duplicate unloading slips had been delivered to the compress company on six of these cars, and they were therefore in readiness for unloading at the time they were destroyed. There is quite a difference, however, between merchandise being ready for delivery, and in its being actually delivered. This distinction is aptly pointed out by the Supreme Court of the United States in Texas & Pacific Ry. Co. v. Clayton, 173 U. S. 348, 19 S. Ct. 421, 425, 43 L. Ed. 725, where it was shown that the railway company had deposited certain merchandise on the wharf of a steamship company and had given that company due and ample notice to remove the goods, but it had failed to do so, and they were destroyed by fire. It was held that the shipment had not passed into the actual custody of the steamship company. The court, in denying the contention that a delivery had taken place because the goods were ready for delivery, said: "The connecting carrier had not given a mate's receipt for the cotton, or assumed control of it. True, it had received notice that the goods were on the wharf, and could be taken into possession, but such notice did not put the cotton into the actual custody of the connecting carrier. The opportunity given it to take possession, or its mere readiness to take possession, was not, under the contract, equivalent to placing the cotton in the actual custody of the steamship line."

The mere placing of the cars of cotton on side tracks adjacent to the compress where they were in readiness for delivery did not place such cotton in the custody of the compress company. If so placing the cars on the siding operated as a delivery of the cotton to the compress company, the cotton was subject to its dominion and control. It would have had the right immediately to open the cars and unload the cotton without consulting the railway company. That it possessed no such right is apparent from a consideration of the undisputed facts. It was shown that the compress company was never permitted to unload cotton from the cars of the railway company unless a representative of that company broke the seal and opened the car, and even then the removal of the cotton was not permitted unless an employee of the railway company was present to check it as it was unloaded. When this joint check was completed, then, and not until then, was the unloading slip signed by the representatives of the railway company and the compress company.

If this shipment had been handled by these companies under a written contract specifying a course of dealing between them in regard to such shipments identical with that pursued under the prevailing custom, such a contract would, as a matter of law, have shown no delivery of the cotton until the cars had been opened by a representative of the railway company and the joint check of their contents made and agreed upon by the representatives of both companies. The uniform custom and. usage shown by the evidence with respect to shipments of this nature implied an agreement to handle the shipment involved in the particular way in which it was handled.

The facts of this case in regard to the custom with reference to delivery of shipments are somewhat similar to those involved in the case of Morgan v. Dibble, 29

Tex. 107, 94 Am. Dec. 264. Chief Justice Moore, in discussing the question as to whether a delivery had taken place under such circumstances, said: " * * * The testimony in the record is to the effect, that by the usage of the trade goods were not regarded by the carrier or consignees as delivered until they were checked off by the agent of the former to the draymen." In the course of the opinion the court further observed: "The goods must also be tendered in a proper time and manner, as well as place, to relieve the carrier from responsibility. Hence it must be within business hours, and under such circumstances that the consignee may receive and put his goods away consistently with their safety. And it is the duty of the carrier to hold the goods in his custody until this may be done, and while he does so he continues to hold them under his responsibility as carrier."

■ We now revert to defendant in error's contention that the Camden policy covered cotton not in the custody of the compress company if it was in closed cars on side tracks at points customarily used for loading on to the compress platform.

It will be observed that the provisions of the Camden policy insure cotton therein described "only while in the custody of the assured *and while contained* in any of the buildings, sheds, platforms and/or yards of the hereinafter described premises of the assured and in closed cars on side tracks customarily used and available for loading and unloading at said compress." (Italics ours.)

The language following the expression "only while in the custody of the assured" was intended to define and make clear the risk and hazard which was to be assumed by the insurance company. If such modifying language had not been used, then cotton legally in the custody of the compress company, wherever situated, would have been covered by the terms of the policy. Under such circumstances, the insurance company would have placed itself in the unenviable attitude of insuring cotton in the custody of the compress company subject to any risk or hazard such company might see fit to place upon it by storing its cotton on premises other than those used in the due course of its business. We think the language used indicates a clear purpose upon the part of the insurance company to confine the risk it proposed to assume in insuring this cotton to such cotton as was in the custody of the compress company while contained on the premises specifically described by the terms of the policy.

The conclusion follows from what has been said that it was error for the Court of Civil Appeals to relieve defendant in error of responsibility for the loss of the transit cotton on the ground that the same was protected under the terms of the Camden policy.

All members of the Court of Civil Appeals were in accord upon the proposition that defendant in error, under the terms of its policy, was liable to plaintiff in error for the loss of the city cotton. This cotton was stored on the compress platform in the name of the owner. Each bale was distinctly marked so that it could be located and segregated from other cotton when ready for shipment. The compress company had issued its clearance receipts for the city cotton and delivered the same to the shipper. The shipper in turn delivered these receipts to the railway company, who thereupon issued and delivered to the shipper its bill of lading covering the specific cotton described in such receipts. From that time the shipper could exercise no dominion or control over this cotton. It was held by the compress company as the agent for the railway company. Upon a very similar state of facts, the Supreme Court of the United States, in the case of Arthur v. Texas & Pacific Ry. Co., 204 U. S. 505, 27 S. Ct. 338, 343, 51 L. Ed. 590, held that the carrier was liable as such, and that the compress company which had not compressed the cotton at the time of the fire "had the actual custody of the cotton as the agent of the railway company."

There is no evidence in the record showing that the compression of this cotton was to be done at the expense of the shipper or his agent. Presumptively, the cotton was compressed for the benefit of the railway company, as such compression served its convenience by enabling it to carry a larger number of bales in each car than it could had the cotton remained uncompressed.

As to the conflicting provisions of the policy with reference to other insurance, we are in accord with the views expressed by Justice Graves in his dissenting opinion; hence we do not deem it necessary to discuss further such question here.

We recommend that the judgment of the Court of Civil Appeals be reversed, and the judgment of the trial court affirmed.

CURETON, Chief Justice.

The judgment of the Court of Civil Appeals is reversed, and that of the district court affirmed, as recommended by the Commission of Appeals.