GREAT COASTAL EXPRESS, INC., To Use of GREAT AMERICAN INS. CO. *v.* FIDELITY & GUARANTY FIRE CORPORATION, et al.

[No. 83, October Term, 1945.]

*Decided March 14, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, GRASON, HENDERSON, and MARKELL, J. J.

*Edwin W. Lowe* and *J. Gilbert Prendergast,* with whom were *Clark, Thomsen & Smith* on the brief, for the appellant.

*Robert D. Bartlett* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

These are suits between two common carriers by motor vehicle, and their insurers, for loss of property by fire on January 19, 1942. Great Coastal Express (plaintiff, appellant) was the initial carrier, Lambert's Transfer (defendant, appellee) the connecting carrier. The question is, whether at the time of the fire the goods had been delivered by Coastal to Lambert's and had come into Lambert's possession.

Coastal operated between Richmond, Virginia, and Baltimore, with Washington as an intermediate stop. Lambert's Baltimore terminal was the middle portion of a one-story frame warehouse at 1145 South Howard street. Lambert's portion was separated by partition walls from the other two portions. There was no platform outside the warehouse; the "warehouse" itself was an enclosed covered platform. A corner of Lambert's space, about 12 feet square, had been partitioned off as an office. A front door from Lambert's space opened on West Street on the south, and a corresponding door on a lot on the north.

Coastal, in the course of its business, customarily accepted shipments to points served by Lambert's and delivered such shipments to Lambert's as a connecting carrier, to be delivered by it to the consignees, especially consignees in Baltimore and Washington. Lambert's would also pick up freight from shippers and at its terminal deliver to Coastal. Local shippers in Baltimore also would deliver freight to Lambert's warehouse to be carried elsewhere by Coastal; Lambert's had no part in hauling or delivering such freight.

For these purposes Coastal "leased dock space" in Lambert's warehouse and paid Lambert's $25 per month "as compensation for dock space and one helper to load shipments from Lambert's dock or to unload shipments left with Lambert's." Lambert's received specified "pick-up and delivery charges" for shipments to Baltimore or Washington. Coastal's "leased" space was not designated by markings, barriers or anything of that kind. Space

near the front of the warehouse, and also near the inner door to the office, was generally used for Coastal. Coastal had a telephone in its own name in Lambert's office; the telephone was answered by Lambert's manager or somebody else in the office. All freight left at the warehouse by Coastal was to be delivered by Lambert's. Freight delivered by local shippers at the warehouse, to be carried elsewhere by Coastal, would bear Coastal's name and be placed in Coastal's space until Coastal's truck would pick it up.

Except while one of Coastal's trucks was delivering or receiving shipments, Coastal had no employers at Lambert's warehouse. Lambert's regular office hours were from about 8.30 in the morning until 9 at night. During these hours it had its manager and a girl in the office and one, and sometimes two, helpers or "platform men." After office hours they had only a watchman, who was on duty from 6 in the evening until 7 in the morning.

During office hours, when freight was brought by Coastal to the warehouse for delivery by Lambert's to the consignees, Coastal's drivers would have waybills in Coastal's name and a manifest listing the shipments they had for Lambert's which would refer to the freight bill number and would include the number of pieces of cartons on the shipment and the weight. After the shipments were checked, to see that they were all in good shape and in order, Lambert's would receipt the manifest, the freight would be deposited in Lambert's warehouse, and Lambert's would make delivery. The drivers and Lambert's helper in the warehouse would unload the freight from the truck.

If one of Coastal's trucks arrived after office hours, the watchman would open the doors for Coastal's driver and allow him to unload his freight. The driver would unload the freight in the warehouse and leave his manifest and other papers at the office, so that they could be checked the following morning. Lambert's manager, when he came in, checked the freight against the manifest. The receipted manifests were usually mailed to Coastal at

Richmond or sent down by Coastal's next driver, whichever was convenient. Lambert's made delivery on Coastal's waybills and in Coastal's name. The waybills were receipted by the consignees and sent by Lambert's to Coastal at regular intervals with its settlement or statement of account.

On January 18, 1942, five shipments, consigned to Baltimore, Washington and other points served by Lambert's, under uniform straight bills of lading, were transported (four in one truck, one in another) by Coastal from Richmond to Baltimore, and in the late evening of January 18th or early morning of January 19th were placed by Coastal's drivers "inside the door" of Lambert's warehouse "for delivery by Lambert's to the respective consignees, the freight bills and manifests accompanying said shipments being left in Lambert's office." While these shipments were in the warehouse, they were destroyed by fire in the early morning of January 19th.

The value of the goods destroyed was $2,863.76. Coastal's insurer paid that amount to the several shippers.

Coastal and Lambert's are both common carriers, subject to Part II of the Interstate Commerce Act, formerly Motor Carrier Act. 1935, 49 U. S. C. A. Chapter 8, Secs. 301-327, Act August 9, 1935, c. 498, Secs. 201-227, 49 Stat. 543, amended, Act September 18, 1940, c. 722, 54 Stat. 919. The Carmack Amendment, which makes the initial carrier liable to the owner for loss of property "caused by" a carrier "to which such property may be delivered or over whose line or lines such property may pass," and entitles the initial carrier to recover from the carrier "on whose line the loss * * * shall have been sustained," 49 U. S. C. A, Sec. 20 (11) (12), Act June 29, 1906, c. 3591, Sec. 7, 34 Stat. 593, Act March 14, 1915, Sec. 1, 38 Stat. 1196, Act August 9, 1916, c. 301, 39 Stat. 441, is applicable to common carriers by motor vehicle. 49 U. S. C. A. Sec. 319, *supra.* Section 215 of the Act, 49, U. S. C. A. Sec. 315, empowers the Interstate Commerce Commission to require common carriers by motor vehicle to file insurance policies, in a sum to be determined by the Commis-

sion, conditioned upon making compensation for property "coming into the possession of such carrier in connection with its transportation service"; any carrier required to compensate for loss "for which a connecting motor common carrier is legally responsible" shall be subrogated to the rights of the owner under any such insurance.

Fidelity & Guaranty Fire Corporation (defendant, appellee) issued to Lambert's a policy, which at the time of the fire was in force and contained an endorsement "to assure compliance" by Lambert's with "Section 215 of the Motor Carrier Act, 1935," with reference to making compensation for property "coming into the possession of such carrier in connection with its transportation service, and with the pertinent rules and regulations of the Interstate Commerce Commission." The policy provides that the insurer "shall not be liable for an amount in excess of $2,000, in respect of any loss of or damage to or aggregate of losses or damages of or to the property hereby insured occurring at any one time and place, nor in any event for an amount in excess of $1,000, in respect of the loss of or damage to such property carried on any one motor vehicle, whether or not such losses or damages occur while such property is on a motor vehicle or otherwise."

There is no contractual limitation (in legal scope or in pecuniary amount) of either Coastal's or Lambert's liability as a common carrier.

Coastal, for the benefit of its insurer, sued separately Lambert's and its insurer. Both cases were tried together before the court without a jury. From judgments for the defendant in each case the plaintiff appeals. Against Lambert's the plaintiff claims $2,863.76, the full amount of the loss; against the insurer the plaintiff claims $2,000, the limit of the insurer's liability.

The facts, as stated above, are undisputed. The question of law is whether at the time of the fire the goods had been delivered to, and had come into the possession of, Lambert's.

On this question both parties, and also the lower court, regard *Pratt v. Grand Trunk Railway Co.*, 95 U. S. 43, 24 L. Ed. 336, as the leading authority; they have minutely discussed the facts of that case. The Grand Trunk Railway was sued for loss of goods carried over its road from Montreal to Detroit. The goods reached Detroit on October 17, 1865, and on the night of the 18th were destroyed by fire. The Grand Trunk claimed to have delivered the goods to the Michigan Central Railroad, a succeeding carrier, and thus to have discharged itself from liability before the fire.

The Grand Trunk had no freight depot at Detroit, except a single section or apartment in the Michigan Central's depot, which was a large building under one roof, divided into sections without any partition wall between them. In the center of the building was a railway track, for cars to be loaded with freight. The only use the Grand Trunk had of its section was for the deposit of all property which came over its road, or was delivered for shipment over it. This section, in common with the rest of the building, was under the control and supervision of the Michigan Central. The Grand Trunk employed in its section two men, who checked freight that came into it. All freight that came into the section was handled exclusively by the Michigan Central's employees, for which and for the use of the section the Grand Trunk paid the Michigan Central a fixed compensation per hundredweight. Goods that came into the section from the Grand Trunk's road, destined over the Michigan Central's road, were, at the time of unloading from the Grand Trunk's cars deposited by the Michigan Central's employees in a certain place in the section, from which they were loaded into the cars of the Michigan Central by its employees when they were ready to receive them; after they were so placed, the Grand Trunk's employees did not further handle the goods. Whenever the agent of the Michigan Central would see any goods deposited in the section set apart for the use of the Grand Trunk, destined over the Michigan Central's line, he would call upon the agent of

the Grand Trunk in the depot, and from a waybill exhibited to him by that agent would take a list of the goods and then also, for the first time, learn their ultimate place of destination and the amount of freight charges due on them. From the information thus obtained from the waybill in the hands of the Grand Trunk's agent, and not before, a waybill would be made out by the Michigan Central for the transportation of the goods over its line.

The goods in question were on October 17, 1865, taken from the cars and deposited in the section used by the Grand Trunk, in the place so assigned for goods so destined. At the time the goods were forwarded from Montreal, in accordance with the usage in such cases, a waybill was made out in duplicate, containing a list of the goods, the names of the consignees, the place to which they were consigned, and the amount of charges against them. One of these waybills was given to the conductor in charge of the train containing the goods; the other was forwarded to the Grand Trunk's agent in Detroit. On arrival of the goods at Detroit the conductor delivered his copy to the Grand Trunk's checking clerk in its section, from which the clerk checked the goods from the car into the section. "It was the practice of the Michigan Central * * *, before forwarding such goods, to take from said waybill in the custody of said checking clerk, in the manner aforesaid, the place of destination and a list of said goods and the amount of accumulated charges, and to collect the same, together with its own charges, of the connecting carrier." 95 U. S. 46, 24 L. Ed. 336. [This practice seems to be a duplication of the practice with respect to the other copy of the waybill in the hands of the Grand Trunk's agent.]

The Supreme Court in its opinion said:

"If the liability of the succeeding carrier had attached, the liability of the defendant was discharged. *Rawson v. Holland*, 59 N. Y. 611; *O'Neill v. New York Central Railroad Co.*, 60 Md. 138.

"The question, therefore, is, had the duty of the succeeding carrier commenced when the goods were burned?

"The liability of a carrier commences when the goods are delivered to him or his authorized agent for transportation, and are accepted. *Rogers v. Wheeler*, 52 N. Y. 262; *Grosvenor v. New York Central Railroad Co.*, 59 *Id.* 34.

If a common carrier agrees that property intended for transportation by him may be deposited at a particular place without express notice to him, such deposit amounts to notice, and is a delivery. *Merriam v. Hartford Railroad Co.*, 20 Conn. 354; *Converse v. Norwick & N. Y. Transp. Co.*, 33 Conn. 166.

"The liability of the carrier is fixed by accepting the property to be transported, and the acceptance is complete whenever the property thus comes into his possession with his assent. *Illinois Railroad Co. v. Smyser*, 38 Ill. 354.

"If the deposit of the goods is a mere accessory to the carriage, that is, if they are deposited for the purpose of being carried without further orders, the responsibility of the carrier begins from the time they are received; but, when they are subject to the further order of the owner, the case is otherwise. *Ladue v. Griffith*, 25 N. Y. 364; *Blossom v. Griffin*, 13 N. Y. 569; *Wade v. Wheeler*, 47 N. Y. 658; *Michigan Railroad Co. v. Schurtz*, 7 Mich. 515.

"The same proposition is stated in a different form when it is said that the liability of a carrier is discharged by a delivery of the goods. If he is an intermediate carrier, this duty is performed by a delivery to the succeeding carrier for further transportation, and an acceptance by him. Auth, *supra.*" 95 U. S. 43-44, 24 L. Ed. 336.

After stating "the precise facts," above stated, the Court concluded:

"We are all of the opinion that these acts constituted a complete delivery of the goods to the Michigan Central Company, by which the liability of the Grand Trunk Company was terminated.

"1. They were placed within the control of the agents of the Michigan Company.

"2. They were deposited by the one party and received by the other for transportation, the deposit being an accessory merely to such transportation.

"3. No further orders or directions from the Grand Trunk Company were expected by the receiving party. Except for the occurrence of the fire, the goods would have been loaded into the cars of the Michigan Central Company, and forwarded, without further action of the Grand Trunk Company.

"4. Under the arrangement between the parties, the presence of the goods in the precise locality agreed upon, and the marks upon them, 'P & F., St. Louis,' were sufficient notice that they were there for transportation over the Michigan road towards the city of St. Louis; and such was the understanding of both parties.

"The cases heretofore cited in 20 Conn. 354, and 33 *id.* 166, are strong authorities upon the point last stated." 95 U. S. 46, 24 L. Ed. 336.

We are likewise of the opinion that in the case at bar the acts done constituted a complete delivery of the goods to Lambert's by which Coastal's liability was terminated. The facts seem simpler, and the conclusion clearer, than in the Pratt case. In the Connecticut cases cited (and later discussed) in the Pratt case it was held that when by agreement or tacit understanding, evidenced by practice and usage, a carrier regularly received for transportation property deposited at a particular place by a preceding carrier, deposit of property at that place, without other notice by the one carrier to the other, constituted a constructive delivery of the property, although the succeeding carrier had not yet taken *actual custody* of it. Such practice and usage amounted to an agreement that such a delivery should of itself be deemed an acceptance by the succeeding carrier for transportation. *Merriam v. Hartford & New Haven Railroad Co.,* 20 Conn. 354, 360, 52 Am. Dec. 344; *Converse v. Norwich & N. Y. Transportation Co.,* 33 Conn. 166, 181; *Pratt v. Grand Trunk Railway Co.,* 95 U. S. 43, 44, 46, 47, 24 L. Ed. 336; *Texas & Pacific Railway Co. v. Clayton,* 173 U. S. 348, 360-362, 43

L. Ed. 725. In the case at bar, as in the Pratt case, there was not a mere constructive delivery, but "the goods passed under the complete control and supervision and into the actual custody of the connecting carrier from the moment they were deposited in the section set apart for them"—in Lambert's exclusively possessed closed warehouse. *Texas & Pacific Railway Co. v. Clayton, supra; cf. Powhatan Steamboat Co. v. Appomattox Railroad Co.,* 24 How. 247, 16 L. Ed. 682.

Checking the freight against the manifest, receipting the manifest and handing it to one of Coastal's drivers, or mailing it, were not part of the delivery or acceptance, but were merely verification by Lambert's of the correctness of the previous delivery and acceptance. Delivery by Lambert's of goods deposited by Coastal was not delayed until delivery to Coastal of the receipted manifest. *Cf. Galveston Wharf Co. v. Galveston, H. & S. A. Railway Co.,* 285 U. S. 127, 134, 76 L. Ed. 659. A letter properly addressed is delivered to the mail by dropping it in a mail box—though this might not be true of an egg or a bomb. We need not consider the legal consequences if Coastal had left in Lambert's warehouse a package addressed to New York or containing a rattlesnake.

The limitation of the liability of Lambert's insurer to $1,000 in respect of loss of property "carried on any one motor vehicle," we think, means carried by Lambert's, and therefore has no application in the case at bar.

Our conclusion on the question of delivery makes it unnecessary to consider an alternative charge by Coastal of negligence on Lambert's part with respect to the fire.

> *Judgment reversed, and judgment entered for the appellant against Lambert's for $2,863.76 and against Lambert's insurer for $2,000 (part of the same $2,863.76), with costs.*